## SOUTHERN RAILWAY CO. *v.* LUNSFORD, ADMINISTRATRIX.

No. 399. Submitted February 10, 1936.—Decided March 2, 1936.

*Messrs. G. E. Maddox, H. O'B. Cooper, Sidney S. Alderman,* and *S. R. Prince* submitted for petitioner.

*Messrs. Reuben R. Arnold* and *B. P. Gambrell* submitted for respondent.

MR. JUSTICE McREYNOLDS delivered the opinion of the court.

Respondent's intestate, J. M. Cox, driver of the engine on petitioner's fast train from Birmingham to Atlanta, lost his life when it overturned. As the train moved forty miles per hour over a six degree curve to the left, something, apparently a stone, turned the wheels of the front truck to the right and off the rails. After bumping over the cross ties for seven-tenths of a mile they struck a switch and the upset followed.

The front or boiler end of the locomotive found support through a rigidly attached center casting rounded to fit, some three or four inches, into another casting made fast to the forward truck. This adjustment permitted passage around curves. The parts were held together by the weight of the locomotive. If the wheels of the truck left the rails the connection would be broken; the locomotive would rest on the driving wheels and short chains attached to it would pull the truck along. Compressed air carried in a hose pipe from the pump, controlled all brakes. Pressure released them; when withdrawn, they automatically applied.

A mechanism, known as Wright's Little Watchman, fastened beneath the locomotive frame, carried a valve closing an entrance into the air line actuated by a lever or trigger. A pull on this would open the valve, let out

air and thus set the brakes. The lever was connected with the forward truck; if its wheels left the track and fell five inches or more a downward pull was expected.

Newly constructed locomotives carry no Watchman; they are not in common use. Petitioner buys and applies them; has experimented with them for seven years; nearly all of its passenger locomotives carry them. The device is not regarded as an essential or integral part. The carrier's General Superintendent testified without contradiction—"The use of this device cannot possibly endanger the operation of the train. It is used in the hope that it may apply the brakes and stop the train in event of derailment of front trucks. My experience with this device is that it sometimes works and sometimes will not work, and that it cannot be relied upon with any degree of certainty." Both witnesses who spoke to the point asserted that it was in an experimental stage; was being tried out with the hope of securing good results; sometimes it had proved effective, sometimes it disappointed. Notwithstanding use during seven years, it remained experimental.

Respondent brought an action for damages in a State Court and relied upon two grounds—(1) failure properly to maintain the track, (2) failure to keep the Watchman in proper condition wherefore it failed to function and arrest the train. The court presented the cause to the jury upon both theories. Judgment for respondent after a favorable verdict was affirmed by the appellate court. Discussion of the first ground is unnecessary; the judgment must be reversed because of error in the charge relative to the second.

The Boiler Inspection Act of June 7, 1924, c. 355, § 2, 43 Stat. 659, U. S. C., Title 45, § 23, provides—

"It shall be unlawful for any carrier to use or permit to be used on its line any locomotive unless said loco-

motive, its boiler, tender, and all parts and appurtenances thereof are in proper condition and safe to operate in the service to which the same are put, that the same may be employed in the active service of such carrier without unnecessary peril to life or limb, and unless said locomotive, its boiler, tender, and all parts and appurtenances thereof have been inspected from time to time in accordance with the provisions of sections 28, 29, 30, and 32 and are able to withstand such test or tests as may be prescribed in the rules and regulations hereinafter provided for."

This enactment has been much considered. *Baltimore & Ohio R. Co. v. Groeger,* 266 U. S. 521; *Napier v. Atlantic Coast Line R. Co.,* 272 U. S. 605; *United States v. Baltimore & Ohio R. Co.,* 293 U. S. 454. But we have not heretofore undertaken to give definite interpretation to the words "parts and appurtenances."

The accepted doctrine is that the Act imposes upon the carrier an absolute and continuing duty to maintain the locomotive, and all parts and appurtenances thereof, in proper condition, and safe to operate in active service without unnecessary peril to life or limb. Also, that, after proper inquiry, the Interstate Commerce Commission may "prescribe the rules and regulations by which the fitness for service shall be determined."

The Commission has promulgated no rule mentioning Little Watchmen; they are not subjected to inspection; without them locomotives "may be employed in the active service . . . without unnecessary peril to life or limb." While most carriers do not use them, their locomotives commonly are in "proper condition."

Respondent does not suggest that the Watchman, whether operative or not, detracted from safety or in any way contributed to the derailment. But it is said that in the circumstances shown the mechanism failed promptly to stop the train, and the jury was at liberty to find

faulty condition which caused the engineer's death. The soundness of this reasoning we need not consider; certiorari was granted because of another point.

Upon the evidence, beyond reasonable doubt, the Watchman was in the experimental stage. Use during seven years gave it no other status, as the witnesses pointed out. Nevertheless, the claim is that when attached it became a part or appurtenance which the carrier was absolutely bound properly to maintain.

With frankness, counsel assert: "There is no doubt that the judge charged that as to this device there was an absolute requirement that it should be in proper condition." In support of this, they urge: The carrier "creates its own standard of safety by the appliances which it places on its own locomotive; and that the Boiler Inspection Act, in requiring all parts and appurtenances on the entire locomotive to be in proper condition, applies to each particular locomotive of every type."

We are unable to accept this view. With reason, it cannot be said that Congress intended that every gadget placed upon a locomotive by a carrier, for experimental purposes, should become part thereof within the rule of absolute liability. So to hold would hinder commendable efforts to better conditions and tend to defeat the evident purpose—avoidance of unnecessary peril to life or limb. Whatever in fact is an integral or essential part of a completed locomotive, and all parts or attachments definitely prescribed by lawful order of the Interstate Commerce Commission, are within the statute. But mere experimental devices which do not increase the peril, but may prove helpful in an emergency, are not. These have not been excluded from the usual rules relative to liability.

The charge in the particulars indicated was erroneous and prejudicial.

*Reversed.*