Mary MARSHALL, individually and as personal representative,
Plaintiff-Appellee,

v.

BURLINGTON NORTHERN, INC.,
Defendant-Appellant.

No. 81–3161.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted March 3, 1982.

Decided Nov. 25, 1983.

1150

Bruce R. Toole, Crowley, Haughey, Hanson, Toole & Dietrich, Billings, Mont., for defendant-appellant.

John C. Hoyt, Hoyt & Trieweiler, Great Falls, Mont., for plaintiff-appellee.

Before KENNEDY, FARRIS, and NORRIS, Circuit Judges.

KENNEDY, Circuit Judge:

In this wrongful death case brought with diversity jurisdiction, the jury found Burlington Northern, Inc. liable for negligence when one of its freight trains collided with a truck at a grade crossing, killing Kenneth Marshall. The jury awarded Marshall's surviving widow $75,000 in compensatory damages and $750,000 in punitive damages. We reverse and remand for a new trial.

I. *Federal Preemption of On-Train Warning Devices*

The Burlington train that collided with Marshall was equipped with a bell, a whistle, two front white headlights, one right above the other, and a revolving amber light behind and above the headlights. Appellee's negligence case was premised largely on the alleged inadequacy of these devices as warning equipment. Appellee presented evidence and argued to the jury that the headlights were inadequate be-cause from a distance they presented a narrow, single beam that made it difficult for motorists to judge the distance and speed of the train. Appellee urged that various available devices used by other railroads, namely, strobe lights and oscillating lights, are effective warning devices that Burlington failed to install. Strobe lights are used in pairs and flash in an alternate sequence to provide reference points for determining speed, distance, and movement. Oscillating lights wave back and forth in a figure eight pattern and bounce off surrounding objects. Had such alerting devices been used on the eastbound train, the jury was told, Marshall, in his rear view mirror or by his peripheral vision, would have been warned that another train was coming toward him from the west.

Federal regulations then applicable required locomotives to have a headlight of sufficient illumination to enable a crew member in the cab to see a dark object as large as a man of average size at a distance of at least 800 feet in front of the headlight, and a "suitable whistle, or its equivalent." 49 C.F.R. §§ 230.231(a), 230.234 (1978) (revised and modified at 49 C.F.R. §§ 229.125, 229.129 (1981)). The Burlington freight train met these requirements.

■ At trial Burlington objected to any testimony concerning additional on-train warning devices. The district court overruled the objection and admitted testimony regarding the uses of strobe or oscillating lights on locomotives. Burlington presents as its primary argument on appeal, that the subject of proper warning equipment to be used on locomotives has been preempted by federal statutes and regulations, and that testimony regarding the railroad's failure to use additional warning lights was improper. We agree.

■ The central inquiry in preemption cases is whether Congress intended to foreclose the challenged local regulation. *Malone v. White Motor Corp.,* 435 U.S. 497, 504, 98 S.Ct. 1185, 1189, 55 L.Ed.2d 443 (1978); *San Diego Unified Port District v. Gianturco,* 651 F.2d 1306, 1310 (9th Cir.1981) (per

curiam), *cert. denied,* 455 U.S. 1000, 102 S.Ct. 1631, 71 L.Ed.2d 866 (1982). A congressional intent to preempt may be explicit in the statute or implicit in its structure and purpose. *Jones v. Rath Packing Co.,* 430 U.S. 519, 525, 97 S.Ct. 1305, 1309, 51 L.Ed.2d 604 (1977); *see also Pacific Gas & Elec. v. State Energy Resources Conservation & Development Comm'n,* —— U.S. ——, ——, 103 S.Ct. 1713, 1722, 75 L.Ed.2d 752 (1983); *Ray v. Atlantic Richfield Co.,* 435 U.S. 151, 157, 98 S.Ct. 988, 994, 55 L.Ed.2d 179 (1978); *Rice v. Santa Fe Elevator Corp.,* 331 U.S. 218, 230, 67 S.Ct. 1146, 1152, 91 L.Ed. 1447 (1947). In this case we must examine two federal statutes regulating railroads, the Boiler Inspection Act of 1911, 45 U.S.C. §§ 22–23, 28–43 (1976), and the Federal Railroad Safety Act of 1970, 45 U.S.C. §§ 421–44 (1976), to determine if they are preemptive of state law.

The Boiler Inspection Act, as amended by Act of March 4, 1915, ch. 169, 38 Stat. 1192, granted the Interstate Commerce Commission the power to prescribe and regulate "all parts and appurtenances" of locomotives. 45 U.S.C. § 23 (1976). That power was transferred to the Secretary of Transportation in 1966 by the Department of Transportation Act, 49 U.S.C. §§ 1651–1659 at 1655(e)(1)(E) (1976). Federal regulation of locomotive equipment under the Boiler Inspection Act has been held a total occupation of the field, preventive of any state or local regulation on the same subject. *Napier v. Atlantic Coast Line R.R.,* 272 U.S. 605, 612–13, 47 S.Ct. 207, 209–10, 71 L.Ed. 432 (1926).

■ The scope of preemption under the Boiler Inspection Act is determined by the interpretation of the words "parts and appurtenances." The Supreme Court interpreted the phrase in *Southern Railway Co. v. Lunsford,* 297 U.S. 398, 56 S.Ct. 504, 80 L.Ed. 740 (1936), as encompassing "[w]hatever in fact is an integral or essential part of a completed locomotive, and *all parts or attachments definitely prescribed by lawful order of the [Secretary]* ...." 297 U.S. at 402, 56 S.Ct. at 506 (emphasis added). Combining this language with *Napier,* we hold

that under the Boiler Inspection Act the state may not impose liability for failure to install a part or attachment of a locomotive if it is "within the scope of the authority delegated to the [Secretary]" to prescribe the same part or attachment. *Napier v. Atlantic Coast Line R.R.,* 272 U.S. at 611, 47 S.Ct. at 209. It is within the scope of the Secretary's authority to prescribe strobe or oscillating lights for locomotives, and any state regulation is therefore preempted.

The precise holding in *Lunsford, supra,* was that an experimental device that had been installed on a locomotive by the railroad was not a "part and appurtenance." *Id.* The Court did not, however, establish "experimental devices" as a general category of locomotive equipment subject to state regulation. Rather, the Court held that railroads have an ordinary duty of care to maintain properly all devices actually attached to a locomotive. This duty is in addition to the absolute liability established by the Boiler Inspection Act for failure to maintain "parts and appurtenances." There is no allegation here that strobe or oscillating lights were attached to the locomotive at the time of the accident, and that Burlington had negligently failed to maintain them. Rather, the allegation is that Burlington was liable for failure to attach strobe or oscillating lights. The ordinary duty of care described in *Lunsford* does not apply in these circumstances, and *Lunsford* in no way affects our holding that the Boiler Inspection Act preempts any state regulation of locomotive equipment.

■ We now consider the effect, if any, of the Railroad Safety Act of 1970. The Railroad Safety Act confers upon the Secretary authority to prescribe "rules, regulations, orders, and standards for all areas of railroad safety supplementing provisions of law and regulations in effect on October 16, 1970 ...." 45 U.S.C. § 431(a) (1976). The Railroad Safety Act does not subsume or recodify previously existing federal statutes on railroad safety. Rather, it leaves existing statutes intact, including the Boiler Inspection Act, and authorizes the Secretary

to fill interstitial areas of railroad safety with supplemental regulation. *Id.*

The preemptive effect of the Railroad Safety Act is different from that of the Boiler Inspection Act. In particular, the Railroad Safety Act provides:

> ... A state may adopt or continue in force any law, rule, regulation, order or standard relating to railroad safety until such time as the Secretary has adopted a rule, regulation, order, or standard covering the subject matter of such State requirement....

45 U.S.C. § 434 (1976).

■ This language means that, unlike the Boiler Inspection Act, the Railroad Safety Act preempts only those state laws where the federal government has acted with respect to the same "subject matter." The Railroad Safety Act does not occupy the field.

■ The main issue is whether the Railroad Safety Act modified the preemptive effect of the Boiler Inspection Act. We conclude that the language and structure of the Railroad Safety Act indicate a congressional intent to leave the Boiler Inspection Act intact, including its preemptive effect. *Accord Consolidated Rail Corp. v. Pennsylvania Public Utilities Comm'n,* 536 F.Supp. 653 (E.D.Pa.1982), *aff'd mem.,* 696 F.2d 981 (3d Cir.1982), *aff'd sum. sub nom., Pennsylvania Public Utilities Comm'n v. Consolidated Rail Corp.,* —— U.S. ——, 103 S.Ct. 1888, 77 L.Ed.2d 280 (1983)..

The Safety Act conferred upon the Secretary authority to adopt regulations "supplementing provisions of law and regulations in effect on October 16, 1970...." 45 U.S.C. § 431 (1976). It does not subsume, replace, or recodify any acts. The logical inference from this structure is that Congress intended to leave unchanged the force and effect of existing federal regulatory statutes. *See* H.R.Rep. No. 91–1194, *reprinted in* 1970 U.S.Code Cong. & Ad.News 4104, 4105, 4108–09.

Moreover, to adopt appellee's argument and find that Congress repudiated the preemptive effect of the Boiler Inspection Act when it adopted 45 U.S.C. § 434, would undermine achievement of one of the explicit purposes of the Railroad Safety Act—national uniformity of railroad regulation. 45 U.S.C. § 434 (1976). As the district court noted in *Consolidated Rail:*

> In expanding the scope of federal rule-making authority in the Railroad Safety Act, Congress allowed the states to continue regulating until displaced by federal rules in the same area. The continued validity of state rules in areas that had always been subject to state regulation does not make railroad regulation less uniform than in the past. Thus, the new preemption rule, as applied to new areas of federal railroad regulatory jurisdiction, does not impair the congressional purpose of uniform regulation.

> In contrast, in areas already governed by the [Boiler] Inspection Act, the states had no regulations. If the Railroad Safety Act were to change the preemption test for those areas, the states could expand their regulatory authority, allowing a new reservoir of differing, and possibly incompatible, railroad-safety law. This would run counter to Congress's purpose of uniform national regulation.

536 F.Supp. at 656–57 [footnotes omitted].

■ Our analysis of the language, structure, and purpose of the Railroad Safety Act persuade us that Congress did not intend to modify the preemptive effect of the Boiler Inspection Act. Burlington, therefore, complied as a matter of law with its duty to provide locomotive warning devices when it met the requirements of 49 C.F.R. §§ 229.125, 229.129 (1981) (formerly 49 C.F.R. §§ 230.231(a), 230.234 (1978)).

■ The reasons we have given thus far suffice to determine this aspect of the case, but we note actions recently taken by the Federal Railroad Administration (FRA). Over a five year period, the FRA studied the effectiveness of strobe and oscillating lights, and, at least at this point, it has concluded not to mandate their installation on locomotives. The FRA notes that it "has concluded that the information in the docket does not support the proposition that

alerting lights are effective in reducing the incidents of grade-crossing accidents. Without that support, a Federal regulatory requirement that railroads equip their locomotives with an alerting light is not justified." 48 Fed.Reg. 20,257 (May 5, 1983). Under the statutory scheme we are here considering, where the FRA has rejected the requirement of strobe or oscillating lights, a state may not require them. " '[W]here failure of . . . federal officials affirmatively to exercise their full authority takes on the character of a ruling that no such regulation is appropriate or approved pursuant to the policy of the statute,' States are not permitted to use their police power to enact such a regulation." *Ray v. Atlantic Richfield Co.,* 435 U.S. at 178, 98 S.Ct. at 1004 (1978) (quoting *Bethlehem Steel Co. v. New York State Labor Relations Board,* 330 U.S. 767, 774, 67 S.Ct. 1026, 1030, 91 L.Ed. 1234 (1947)). The recent action of the FRA is support for the conclusion that the subject has been preempted by administrative action as of this date; but we rely on the other indices of preemption we have discussed for our conclusion that the state regulation was displaced at the time of the accident.

It was, therefore, error for the district court to admit evidence regarding the effectiveness of various locomotive warning lights not required by the Secretary. On retrial, Burlington will be entitled to an instruction regarding its compliance with federal regulations.

## II. *Federal Preemption of Railroad Crossing Warning Devices*

Appellee contended at trial that the railroad was negligent in failing to provide a more adequate warning device at the crossing in question. Appellee's expert testified that the crossbuck, a sign with an X-shaped warning, was inadequate for the crossing, considering the multiple tracks, the possibility of two trains at the crossing, the use of high speed trains, and certain possible restrictions on sight distance. He testified that an automatic gate with flashing lights should have been installed at the crossing.

Burlington argues that evidence of the adequacy of its crossing should have been excluded because federal law also preempts this aspect of common law negligence. Burlington's preemption argument here is based solely on the Railroad Safety Act, since it is clear that the Boiler Inspection Act is not applicable. The question is whether the state is trying to regulate the same "subject matter" already regulated by the Secretary. 45 U.S.C. § 434 (1976).

The Railroad Safety Act requires the Secretary to study and develop solutions to problems associated with railroad grade crossings. 45 U.S.C. § 433 (1976). The Highway Safety Act of 1966, Pub.L. No. 89–564, 80 Stat. 731 (1966) (as amended, codified at 23 U.S.C. §§ 401–404 (1982)), directs the Secretary to develop uniform standards and to approve state-designed highway safety programs that comply with them, which are then eligible to receive federal financial assistance. 23 U.S.C. § 402 (1982). The Secretary, through the Federal Highway Administration, prescribed procedures to obtain uniformity in highway traffic control devices and adopted the Manual on Uniform Traffic Control Devices on Streets and Highways, *see* 23 C.F.R. § 655.601 (1981), which also was adopted by Montana, *see* Mont.Code Ann. § 61–8–202 (1981). The manual prescribes that the selection of devices at grade crossings and the approval for federal funds is to be made by local agencies with jurisdiction over the crossing. Thus, the Secretary has delegated federal authority to regulate grade crossings to local agencies.

The locality in charge of the crossing in question has made no determination under the manual regarding the type of warning device to be installed at the crossing. Until a federal decision is reached through the local agency on the adequacy of the warning devices at the crossing, the railroad's duty under applicable state law to maintain a "good and safe" crossing, Mont. Code Ann. § 69–14–602 (1981), is not preempted. Evidence concerning the adequacy of the warning device at the crossing in question was properly admitted.

### III. Jury Instruction

To establish Kenneth Marshall's contributory negligence, Burlington requested the trial court to instruct the jury on the duty of motorists under Mont.Code Ann. § 61–8–349(1) (1981), adopted in 1919. Appellee argued that this provision had been overruled or modified by Mont.Code Ann. § 61–8–347 (1981), adopted in 1955, which prescribed a less strict standard. The district court agreed with appellee and gave the latter instruction. Burlington contends the district court erred in interpreting Montana law, and urges that according to *O'Brien v. Great Northern R.R. Co.,* 148 Mont. 429, 421 P.2d 710 (1966), *cert. denied,* 387 U.S. 920, 87 S.Ct. 2034, 18 L.Ed.2d 974 (1967), the earlier statute remained in effect after the enactment of the more recent statute.

Each of the statutes in question sets forth the duty of motorists to stop in certain situations at uncontrolled grade crossings. The earlier statute sets forth a duty to stop whenever "a moving train is within sight." Mont.Code Ann. § 61–8–349(1) (1981). The more recent statute sets forth a more circumscribed obligation that requires a stop when a train "by reason of its speed or nearness to such crossing, is an immediate hazard." Mont.Code Ann. § 61–8–347 (1981). Under these circumstances, we find no error in the district court's finding that the more recent statute establishes the applicable duty of motorists. To hold otherwise would render the provisions of the more recent enactment nugatory.

In the circumstances of this case, moreover, the difference in duty imposed by the 1919 and 1955 statutes is not significant. In light of the district court's instruction on Marshall's common law duty to exercise reasonable care, which included a duty to take reasonable precautions to satisfy himself by actual observation that there was no danger from any train at the crossing and a duty not to chance known hazards, we hold that the jury was fully and properly instructed regarding Marshall's duty of care.

### IV. Evidence of Assault

Appellee introduced testimony from Mary Marshall that, sometime after her husband's death, she was assaulted when leaving work one evening. Burlington claims this was prejudicial and inflammatory. The trial court did not err in admitting the evidence, which was relevant on the issue of damages to show Mary could not maintain her night job after her husband's death because he no longer could meet her after work. Appellee did not emphasize the testimony or present it in an inflammatory manner, and Burlington did not offer a proper limiting instruction, as the trial court had invited.

### V. Evidence of Grandchildren's Consumption

Kenneth Marshall had lived with and supported Mary and her grandchildren, but appellee's counsel withdrew the grandchildren as plaintiffs prior to trial. Burlington argues that the amount Kenneth would have contributed to the support of the grandchildren should be deducted from his future earnings in computing Mary's damages, because she alone is entitled to recover for loss of comfort and the grandchildren should not recover indirectly. Though inventive, the argument has no merit. Mary was entitled to recover the portion of Kenneth's earnings that he would have contributed to her for her support, and it is irrelevant that she elected to use part of the money for her grandchildren.

As it was error for the district court to admit evidence regarding the effectiveness of oscillating lights and strobe lights as on-train warning devices, we reverse the judgment and remand the case for a new trial.

REVERSED AND REMANDED.