882 F.2d 1349
 58 USLW 2148
 BURLINGTON NORTHERN RAILROAD COMPANY; Chicago and North
Western Transportation Company; Duluth, Missabe & Iron
Range Railway Company; Duluth, Winnipeg & Pacific Railway
Company; Soo Line Railroad Company; Dakota, Minnesota &
Eastern Railroad Corporation; Minnesota Commercial Railway
Company; MNVA Railroad, Inc.; Otter Tail Valley Railroad
Company, Inc.; and Wisconsin Central Ltd., Appellees,
v.
STATE OF MINNESOTA; Rudolph G. Perpich, Governor of the
State of Minnesota; Hubert H. Humphrey III, Attorney
General of the State of Minnesota; Michael A. McGrath,
State Treasurer of the State of Minnesota; United
Transportation Union; R.L. Marceau; G.P. Schiller; D.B.
Snyder; Mel Winter; D.F. Markgraf; P.H. Bausch; R.D.
Darsie; Raymond Nyman; Raymond A. Rask; J.E. Beyer; W.G.
Frenz; and J.A. Morgan, Appellants.
 No. 88-5358.
 United States Court of Appeals,
Eighth Circuit.
 Submitted March 15, 1989.
Decided Aug. 23, 1989.
 
 Mark B. Levinger, St. Paul, Minn., for appellants.
 Betty Jo Christian, Washington, D.C., for appellees.
 Before JOHN R. GIBSON and BOWMAN, Circuit Judges, and FLOYD R. GIBSON, Senior Circuit Judge.
 JOHN R. GIBSON, Circuit Judge.
 
 
 1
 The single issue in this appeal is whether the Minnesota occupied caboose law, Minn.Stat. Sec. 219.559 (1988), which requires that an occupied caboose be attached to the end of a train, is preempted by the Federal Railroad Safety Act, 45 U.S.C. Secs. 421-444 (1982), and the regulations of the Federal Railroad Administration (FRA). Burlington Northern Railroad Company and a group of other railroads operating in Minnesota brought this action challenging the Minnesota caboose statute on a variety of constitutional grounds, including that of preemption by the Railroad Safety Act. The district court granted Burlington Northern's motion for summary judgment, holding that the adoption of certain regulations concerning rear-end marking devices and power brakes on trains by the FRA implicitly preempted the Minnesota law. On appeal the State of Minnesota challenges the district court's holding that its caboose law is preempted. We affirm the judgment of the district court.[1]
 
 I.
 
 2
 When cabooses were first introduced in the nineteenth century, they served a distinct operating function. In Missouri Pacific R.R. v. Railroad Comm'n of Tex., 850 F.2d 264 (5th Cir.), cert. denied, --- U.S. ----, 109 S.Ct. 794, 102 L.Ed.2d 785 (1988), the Fifth Circuit summarized the history of the caboose:
 
 
 3
 Cabooses once were essential to train operation. Braking and speed were controlled in the caboose, and from it the crew could observe the movement of the train and check for overheating of the brakes, axles, and wheels. Technological advances over the years have greatly diminished the importance of cabooses to safe train operation. Automatic brakes are controlled from the locomotive, advances in wheel bearings decrease the risk of overheating, and monitoring devices simulate rear-car observation.
 
 
 4
 Missouri Pacific, 850 F.2d at 265. Thus, with the development and widespread use of power brakes, centralized traffic control, automatic block signal systems and automated rear-end devices, the operational and safety justifications for the caboose diminished. Industry-wide collective bargaining agreements, however, still required that cabooses be used in most circumstances. In 1982, this caboose requirement was largely eliminated when the United Transportation Union entered into an agreement with most of the nation's railroads, including Burlington Northern, which authorized a railroad to seek, with the union's approval or through arbitration, removal of cabooses from its trains.[2]
 
 
 5
 Following ratification of the 1982 collective bargaining agreement, four states, including Minnesota, enacted legislation requiring the use of cabooses.[3] Enacted in 1988, the present Minnesota caboose law states: "a railroad company may not operate a freight train 2,000 feet long or longer, if the train is handling placarded cars or is operated without block signals, unless the rear car is a caboose that is occupied by at least one member of the train crew." Minn.Stat. Sec. 219.559(1). The law expressly exempts certain trains, such as unit grain and unit taconite trains. Id. at Sec. 219.559(2)(b)(4 & 5). It also exempts a railway company that operates a railroad in Minnesota and the two adjoining states, if the total trackage of the railroad company, including trackage rights, is more than 950 miles and less than 1,000 miles. Id. at Sec. 219.559(2)(b)(3).[4] Thus, the Minnesota law requires railroads operating within the state to add cabooses to those trains that previously ran without cabooses pursuant to the 1982 bargaining agreement.
 
 
 6
 In 1986, the technological advances that made it possible to operate a train safely without a caboose led the Federal Railroad Administration, under the authority of the Federal Railway Safety Act, to enact two regulations affecting cabooses.[5] The first FRA regulation concerned rear-end marking devices for passenger, commuter and freight trains. A train crew member previously had been required to visually monitor the condition of the marking device, which, as a practical matter, meant that an employee had to be stationed in a caboose at the end of the train. See 51 Fed.Reg. 25,180-82 (1986). The amended regulation, however, permitted the use of radio telemetry equipment as an alternative to visual operation, thereby facilitating the operation of cabooseless trains. See 49 C.F.R. Secs. 221.5-.16 (1987).
 
 
 7
 The second FRA regulation amended power brake rules by permitting the use of a telemetry device to monitor brake pipe pressure at the rear car of a train in lieu of visual observation. See 49 C.F.R. Secs. 232.13, 232.19 (1987). This regulation also accommodated cabooseless trains. The FRA adopted these rules only after it determined that the use of the telemetry devices would be at least as safe as visual observation from the rear of the train. See 50 Fed.Reg. 35,637, 35,641 (1985).
 
 
 8
 Burlington Northern brought this action challenging Minnesota's caboose law on a number of grounds, including federal preemption, the unlawful exercise of state police power, and federal and state constitutional claims involving the commerce, contract and due process clauses. Burlington Northern then filed a motion for summary judgment based on their claim that the actions of the FRA pursuant to the Federal Railroad Safety Act had preempted the Minnesota law. Ruling from the bench following an oral argument, the district court held that the Minnesota caboose law had been preempted and stated:The promulgation of [the power brake and rear-end marking device] regulations by the FRA, in light of objections raised by commentators to the adoption of any regulations permitting or facilitating the operation of trains without cabooses, takes on the character of a ruling that no such regulation is appropriate or approved pursuant to the policy of the statute.
 
 
 9
 The State of Minnesota appeals, arguing that because neither Congress nor the FRA intended to preempt Minnesota's caboose law, the FRA regulations should not be given preemptive effect.
 
 II.
 
 10
 A federal statute preempts a state law under the Supremacy Clause, when "Congress has either explicitly or implicitly declared that the States are prohibited from regulating" the subject matter of the state law. Ray v. Atlantic Richfield Co., 435 U.S. 151, 157, 98 S.Ct. 988, 994, 55 L.Ed.2d 179 (1978). As there is no federal law that directly addresses the requirement of cabooses, we are not concerned with express preemption, but rather we must decide if preemption is implied by the federal statutory scheme. Missouri Pacific, 850 F.2d at 267. In determining if preemption is implied by federal law, the Supreme Court has stated:
 
 
 11
 [I]n the absence of express pre-emptive language, Congress may indicate an intent to occupy an entire field of regulation * * *. [I]f Congress has not displaced state regulation entirely, it may nonetheless preempt state law to the extent that the state law actually conflicts with federal law. Such a conflict arises when compliance with both state and federal law is impossible, or when the state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress."
 
 
 12
 Michigan Canners & Freezers Ass'n v. Agricultural Mktg. & Bargaining Bd., 467 U.S. 461, 469, 104 S.Ct. 2518, 2523, 81 L.Ed.2d 399 (1984) (citations omitted).
 
 
 13
 The state first contends that the district court, in holding that Minnesota's caboose law was preempted, relied upon an unreasonably narrow view of the state's role in railway safety matters. The Federal Railroad Safety Act, however, creates a comprehensive scheme for the regulation of rail safety, requiring that "laws, rules, regulations, orders, and standards relating to railroad safety shall be nationally uniform to the extent practicable." 45 U.S.C. Sec. 434 (1982). The Act explicitly limits the state's role in safety regulation in section 434, which provides:
 
 
 14
 A State may adopt or continue in force any law, rule, regulation, order, or standard relating to railroad safety until such time as the Secretary has adopted a rule, regulation, order, or standard covering the subject matter of such State requirement. A State may adopt or continue in force an additional or more stringent law, rule, regulation, order, or standard relating to railroad safety when necessary to eliminate or reduce an essentially local safety hazard, and when not incompatible with any Federal law, rule, regulation, order, or standard, and when not creating an undue burden on interstate commerce.
 
 
 15
 Section 434 on its face provides for broad preemption, permitting state regulation of railroad safety in only two circumstances: (1) if the FRA has not acted to "[cover] the subject matter" of the state law, or (2) where the FRA has so acted, if the state law is necessary to eliminate an essentially local safety concern and satisfies the other specified conditions. Several courts have confirmed that section 434 creates a broad preemption standard. In National Ass'n of Regulatory Util. Comm'rs v. Coleman, 542 F.2d 11 (3d Cir.1976), the court held that "the Act was intended to preempt the field of rail safety" and that "[s]tate adopted regulations, with the exception of those which are designed to eliminate an essentially local safety hazard, are permitted to continue in force only until such time as a federal regulation covering the same subject matter is promulgated." Id. at 13. See also Missouri Pacific, 850 F.2d at 268 ("virtually all state regulations affecting the train itself appear preempted by federal law"); Donelon v. New Orleans Terminal Co., 474 F.2d 1108, 1112 (5th Cir.) ("[t]he Act specifically authorizes a narrow spectrum of deviation from national uniformity"), cert. denied, 414 U.S. 855, 94 S.Ct. 157, 38 L.Ed.2d 105 (1973).[6]
 
 
 16
 The state next argues that the FRA regulations deal only with power brakes and rear-end marking devices, not cabooses, and that such regulations do not "[cover] the subject matter" of the Minnesota occupied caboose law, as required for preemption under section 434.[7] "For purposes of Sec. 434 of the [Railroad Safety Act], a state regulation 'covers the same subject matter' as an FRA regulation if it addresses the same safety concerns." Burlington N. R.R. Co. v. State of Mont., 880 F.2d 1104, 1105 (9th Cir.1989). We hold that the FRA regulations cover the subject matter of the caboose requirement, and displace any opposing state law.
 
 
 17
 The caboose requirement was specifically presented to the FRA during its rulemaking proceedings amending the power brake and rear-end marking device rules. Several parties opposed these amended rules at the rulemaking proceedings, asserting that a caboose was necessary to operate a train safely. Proponents of the new rules also filed responsive comments and submitted evidence to demonstrate that trains operating without cabooses do not impair safety.
 
 
 18
 After reviewing all of the evidence and comments, the FRA did not impose a caboose requirement in its amended regulations concerning power brake and rear-end marking devices. In an FRA background report permitting the use of end-of-train telemetry devices as substitutes for visual brakes inspection, the FRA concluded that there was no merit to the contentions of the caboose advocates "that elimination of a caboose from the end of a train adversely affects safety," or that new requirements were necessary "to counteract the perceived safety detriment of cabooseless trains." 51 Fed.Reg. 17,300 (1986). The FRA further stated in the report:
 
 
 19
 [N]othing in any current FRA regulation requires a caboose on any train, nor does anything in the final rule issued in this docket authorize the removal of a caboose. The determination on whether a railroad uses a caboose on any given line is made through the collective bargaining process. Moreover, the FRA does not consider the lack of a caboose to be a safety issue per se. While this final rule may facilitiate railroads' obtaining economic benefits from cabooseless operations, it does not in any way determine whether a caboose will or will not be used.
 
 
 20
 Id. at 17,300-301. It is clear from these comments that the FRA did not consider the use of a caboose to be a "safety concern," or necessary at the end of a train.
 
 
 21
 The Supreme Court has held that " 'where failure of ... federal officials affirmatively to exercise their full authority takes on the character of a ruling that no such [state] regulation is appropriate or approved pursuant to the policy of the statute,' States are not permitted to use their police power to enact such a regulation." Ray, 435 U.S. at 178, 98 S.Ct. at 1005 (quoting Bethlehem Steel Co. v. New York State Labor Relations Bd., 330 U.S. 767, 774, 67 S.Ct. 1026, 1030, 91 L.Ed. 1234 (1947)). Because the FRA concluded that it does not consider the lack of a caboose to be a safety issue, we are satisfied that the FRA's failure to enact a mandatory caboose requirement has "taken on the character of a ruling that no such regulation is appropriate," and is therefore the kind of inaction that has preemptive effect. Ray, 435 U.S. at 178, 98 S.Ct. at 1004. As Minnesota's mandatory caboose requirement stands in direct conflict with the FRA's implied ruling that such a regulation is not appropriate, we hold that the Minnesota statute is preempted.
 
 
 22
 The state maintains, however, that the FRA has specifically indicated in its comments that it decided not to rule on the caboose issue, relying on the FRA's statements that nothing "in the final rule authorize[s] the removal of a caboose" and that the final rule does not "determine whether a caboose will or will not be used." We reject this argument. These comments simply reflect the FRA's recognition that collective bargaining agreements might require that manned cabooses remain on some trains despite the lack of any safety justification. In Missouri Pacific, 850 F.2d at 268, the Fifth Circuit addressed the identical issue of preemption of a state's caboose legislation and held:
 
 
 23
 The FRA has determined it is appropriate for itself to do nothing about cabooses, and affirmatively has left the matter not to the states but to collective bargaining. Under these circumstances, we are compelled to conclude that the FRA has impliedly preempted state regulation of cabooses.
 
 
 24
 We find further support for our conclusion that Minnesota's law is preempted in Burlington N. R.R. Co. v. State of Mont., 880 F.2d 1104 (9th Cir.1989). Faced with the same decision of whether the FRA regulations preempt Montana's law requiring cabooses, the Ninth Circuit recently held that the FRA, in its rulemaking proceedings, determined that the use of electronic devices on trains instead of visual inspection was safe and that cabooses were therefore unnecessary for train safety. The court concluded that under section 434 "this is enough to preempt state legislation to the contrary." Burlington, at 1108. See also Marshall v. Burlington N., Inc., 720 F.2d 1149 (9th Cir.1983).[8]
 
 
 25
 The state further argues that notice of rulemaking proceedings is a prerequisite to preemption of state law by an FRA regulation, and that in this case the FRA never gave adequate notice to hold hearings with regard to the caboose issue. We are not persuaded. The state points to Marshall, 720 F.2d 1149, where the FRA's rejection of a regulation requiring a train to have alerting lights was given preemptive effect. There, the FRA notified the parties that such lights would be examined in its rulemaking proceeding. Marshall, however, indicates that if the FRA gives due consideration to an action, its failure to act will be given preemptive effect. Id. at 1153-54; see Southern Pacific Transp. Co. v. Public Utilities Comm'n of the State of Cal., 647 F.Supp. 1220, 1226 (N.D.Cal.1986), aff'd, 820 F.2d 1111 (9th Cir.1987) (per curiam). As stated above, we are satisfied that the FRA clearly considered the caboose issue when it amended the power brake and rear-end marking device rules.
 
 
 26
 Further, the final action taken by an agency often differs from the proposed rule, in many cases reflecting the comments of interested parties. In such cases the original notice is adequate if it is "sufficiently descriptive of the 'subjects and issues involved' so that interested parties may offer informed criticisms and comments. But the notice need not contain 'every precise proposal which [the agency] may ultimately adopt as a rule.' " Ethyl Corp. v. EPA, 541 F.2d 1, 48 (D.C.Cir.) (en banc) (citations omitted), cert. denied, 426 U.S. 941, 96 S.Ct. 2662, 49 L.Ed.2d 394 (1976) (cited with approval in Northwest Airlines, Inc. v. Goldschmidt, 645 F.2d 1309, 1320 (8th Cir.1981)); see also Walmsley v. Block, 719 F.2d 1414, 1417-18 (8th Cir.1983). In this case, the relevant notices of proposed rulemaking identify telemetry devices as an alternative to "visual monitoring" from the "rear car" of the train.[9] Many interested parties understood that the proposed rules would affect the use of a caboose, and they submitted comments opposing or advocating the proposed rules, specifically addressing the safety effects of the elimination of a caboose from the end of a train. We therefore conclude that the FRA's notice sufficiently described the caboose requirement issue.
 
 
 27
 In sum, we hold that the FRA power brake and rear-end marking device regulations, which accommodate the operation of cabooseless trains, and the FRA's refusal to impose a caboose requirement preempt the Minnesota occupied caboose law. Accordingly, we affirm the judgment of the district court.
 
 
 
 [1]
 The Honorable Robert G. Renner, United States District Judge for the District of Minnesota
 
 
 [2]
 The collective bargaining agreement stated that caboose removal would be handled on an individual railroad basis. Although the agreement placed a twenty-five percent limit on the number of cabooses that could be removed pursuant to an arbitration award, potentially all cabooses could be removed with the Union's consent. Burlington N. R.R. Co. v. State of Neb., 802 F.2d 994, 997 n. 1 (8th Cir.1986)
 
 
 [3]
 None of those four laws is now in effect. The laws of Montana, Texas and Minnesota have been held to be preempted by the FRA's refusal to mandate cabooses in the 1986 rulemaking proceeding. See, Missouri Pacific R.R. Co. v. Railroad Comm'n of Tex., 671 F.Supp. 466 (W.D.Tex.1987), aff'd, 850 F.2d 264 (5th Cir.1988); Burlington N. R.R. Co. v. State of Mont., 880 F.2d 1104 (9th Cir.1989). The fourth, the Nebraska caboose law, was repealed. See Burlington N. R.R. Co. v. State of Neb., 802 F.2d 994, 997 n. 3 (8th Cir.1986)
 
 
 [4]
 We were informed at oral argument that the railroad to which this exception referred was the Dakota, Minnesota and Eastern Railroad
 
 
 [5]
 Congress enacted the Railroad Safety Act in 1970 "to promote safety in all areas of railroad operations." 45 U.S.C. Sec. 421. To accomplish this purpose, the Act authorized the Secretary of Transportation to "prescribe, as necessary, appropriate rules, regulations, orders and standards for all areas of railroad safety," id. at Sec. 431, and the Secretary has delegated these responsibilities to the FRA. 49 C.F.R. Sec. 1.49(m) (1988)
 
 
 [6]
 The state argues that both the Fifth Circuit in Missouri Pacific and the Montana district court in Burlington N. R.R. Co. v. State of Mont. misconstrue the term "covering the subject matter" in section 434 by interpreting the background comments in a manner inconsistent with congressional intent. It further contends that the legislative history behind section 434 indicates that section 434 should be interpreted narrowly. We are satisfied, however, that the interpretation we give the statute, consistent with the Fifth and Ninth Circuits, is supported by the legislative history. See H.R.Rep. No. 1194, 91st Cong., 2d Sess., (1970), U.S.Code Cong. & Admin.News 1970, pp. 4104, 4109-10; 116 Cong.Rec. 27,61 3 (1970) (statement of Sen. Pickle)
 
 
 [7]
 The state does not attempt to defend the Minnesota caboose requirement as "necessary to eliminate * * * an essential local safety hazard." See 45 U.S.C. Sec. 434
 
 
 [8]
 The state also relies on Southern Pacific Transp. Co. v. Public Utilities Comm'n of the State of Cal., 647 F.Supp. 1220 (N.D.Cal.1986), aff'd, 820 F.2d 1111 (9th Cir.1987) (per curiam), where the Ninth Circuit affirmed a district court holding that an FRA policy statement regarding walkway regulation did not preempt state walkway regulations. This same preemption issue raised in Southern Pacific--the validity of state walkway regulations--was decided by the Fifth Circuit in Missouri Pacific R.R. Co. v. Railroad Comm'n of Tex., 833 F.2d 570 (5th Cir.1987) (MOPAC I ). When that court subsequently decided the caboose preemption issue, see Missouri Pacific, 850 F.2d 264, it explicitly found the two preemption issues to be entirely different. We are convinced by the Fifth Circuit's explanation of why both Southern Pacific and its own prior dictum in MOPAC I concerning state walkway requirements are inapposite to the caboose issue:
 The situation before us differs significantly from that in MOPAC I. There, this Court determined that the FRA had declined certain rail walkway requirements because the proposed rules were vague or otherwise defective--not because the FRA considered walkway requirements unjustified. MOPAC I at 575, quoting Southern Pacific Transportation Co. v. Public Utilities Comm'n of California, 647 F.Supp. 1220 (N.D.Cal.1986). Consequently, we determined in MOPAC I that the FRA had not impliedly preempted state regulation of rail walkways; rather, the FRA appeared to be saying "we haven't looked at walkways yet." Id. at 576.
 In the instant case, however, the FRA background information accompanying 49 C.F.R. 232, permitting the use of end-of-train telemetry devices as substitutes for visual brake inspection, demonstrates FRA consideration of safety in cabooseless operations.
 Missouri Pacific, 850 F.2d at 267.
 
 
 [9]
 Moreover, while the word "caboose" does not appear in the notices of proposed rulemaking, the phrase "rear car" appears several times. See, e.g., 50 Fed.Reg. at 35,636, 35,640