**BURLINGTON NORTHERN RAILROAD COMPANY, Plaintiff,**

v.

**CITY OF CONNELL, Defendant.**

**No. CS-92-337-FVS.**

United States District Court, E.D. Washington.

Jan. 5, 1993.

Kurt W. Kroschel, Kroschel & Gibson, Bellevue, WA, for plaintiff.

Robert G. Swisher, Gladstone & Swisher, Richland, WA, for defendant.

## ORDER GRANTING PRELIMINARY INJUNCTION

VAN SICKLE, District Judge.

BEFORE THE COURT is Burlington's motion for a preliminary injunction (Ct.Rec. 2). Burlington is represented by Kurt W. Kroschel; Connell is represented by Robert G. Swisher.

## I. BACKGROUND

A Burlington Northern railroad line passes through Connell, Washington. (Affidavit of Charles A. Lundgren (Ct.Rec. 6), Exhibit 1 (map).) Between twenty-five and thirty-five trains use the line each day. Of that number, ten to fifteen travel through the city between midnight and six a.m. (Affidavit of Donald L. Maze (Ct.Rec. 5) at 2.)

There are two public railroad crossings in Connell. In both instances, a two-lane city street crosses at least three tracks. (Lundgren Affidavit, Exhibits 2A, 2B (diagrams).)

To warn motorists, Burlington has installed signs, lights, and drop-arm gates at both crossings. As a train approaches a crossing, the lights flash and the gate drops. In addition, the lead locomotive is equipped with a headlight and whistle. The engineer is required to sound a series of whistle blasts when the locomotive nears a crossing.

The whistle blasts are piercing. When sounded at night, they awaken sleeping residents. (Affidavit of the Mayor of the City of Connell (Ct.Rec. 17).) Needless to say, the whistle blasts have led to numerous complaints. As a result, the city enacted Ordinance # 605. It prohibits train crews from sounding locomotive whistles within the city between midnight and six a.m.—except in exigent circumstances. (Affidavit of Ted N. Bissen (Ct.Rec. 4), Exhibit 1.)

In response, Burlington filed this action seeking declaratory and injunctive relief. Burlington alleges that the ordinance is preempted by either the Federal Railroad Safety Act ("FRSA"),[1] or the Locomotive Boiler Inspection Act ("LBIA"),[2] or the combined effect of the two statutes.

1. Pub.L. 91–458, 84 Stat. 971 (1970), as amended, 45 U.S.C. §§ 421–445, 447 (1992).

2. 36 Stat. 913 (1911), as amended, 45 U.S.C. §§ 22–23, 28–43 (1992).

## II. INJUNCTIVE RELIEF

■ Burlington's request for a preliminary injunction is governed by Fed.R.Civ.P. 65. Under that rule, relief is warranted "if the moving party demonstrates either (1) a combination of probable success on the merits and the possibility of irreparable injury, or (2) that serious questions are raised and the balance of hardships tips sharply in its favor." *EEOC v. Recruit U.S.A., Inc.*, 939 F.2d 746, 752 (9th Cir. 1991) (citing *Chalk v. United States Dist. Court*, 840 F.2d 701, 704 (9th Cir.1988)).

### A. Probability of Success

The Supremacy Clause provides "that the laws of the United States 'shall be the supreme Law of the Land; ... any Thing in the Constitution or Laws of any state to the Contrary notwithstanding.'" U.S. Const. Art. VI, cl. 2. *See Cipollone v. Liggett Group, Inc.*, — U.S. —, —, 112 S.Ct. 2608, 2617, 120 L.Ed.2d 407 (1992) (plurality opinion). "[U]nder the Supremacy Clause, from which ... pre-emption doctrine is derived, 'any state law, however clearly within a State's acknowledged power, which interferes with or is contrary to federal law, must yield.'" *Gade v. National Solid Wastes Management Ass'n*, — U.S. —, —, 112 S.Ct. 2374, 2388, 120 L.Ed.2d 73 (1992) (quoting *Felder v. Casey*, 487 U.S. 131, 138, 108 S.Ct. 2302, 2307, 101 L.Ed.2d 123 (1988)).

■ Whether state law is pre-empted depends upon congressional intent. *Cipollone*, — U.S. at —, 112 S.Ct. at 2617; *Wisconsin Public Intervenor v. Mortier*, — U.S. —, —, 111 S.Ct. 2476, 2481, 115 L.Ed.2d 532 (1991). Intent may be express or implied. *FMC Corp. v. Holliday*, 498 U.S. 52, 57–58, 111 S.Ct. 403, 407, 112 L.Ed.2d 356 (1990).

■ There are three circumstances in which state law is pre-empted. *English v. General Elec. Co.*, 496 U.S. 72, 78–80, 110 S.Ct. 2270, 2275, 110 L.Ed.2d 65 (1990). In the first instance, a federal statute may contain a provision which explicitly supplants state authority. *Mortier*, — U.S. at —, 111 S.Ct. at 2481. Absent such language, state law may be pre-empted when it "regulates conduct in a field that Congress intended the Federal Government to occupy exclusively." *English*, 496 U.S. at 79, 110 S.Ct. at 2275. Finally, pre-emption "may occur to the extent that state and federal law actually conflict." *Mortier*, — U.S. at —, 111 S.Ct. at 2482. Conflict occurs "where it is impossible for a private party to comply with both state and federal requirements, *see, e.g., Florida Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 142–143, 83 S.Ct. 1210, 1217–1218, 10 L.Ed.2d 248 (1963), or where state law 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'" *English*, 496 U.S. at 79, 110 S.Ct. at 2275 (quoting *Hines v. Davidowitz*, 312 U.S. 52, 67, 61 S.Ct. 399, 404, 85 L.Ed. 581 (1941)).

### 1. Federal Railroad Safety Act

■ Congress enacted the FRSA to "promote safety in all areas of railroad operations and to reduce railroad-related accidents." 45 U.S.C. § 421. Legislation was necessary "to fill gaps in statutory safety coverage which had grown so large as to render impossible any meaningful rail safety regulations." *Chicago Transit Authority v. Flohr*, 570 F.2d 1305, 1308 (7th Cir. 1977).[3]

The FRSA addresses the question of pre-emption. *See Burlington Northern Railroad Co. v. Montana*, 880 F.2d 1104, 1105 (9th Cir.1989). It provides:

The Congress declares that laws, rules, regulations, orders, and standards relating to railroad safety shall be nationally uniform to the extent practicable. A State may adopt or continue in force any law, rule, regulation, order, or standard relating to railroad safety until such time

---

**3.** Under the FRSA, the Secretary of Transportation is authorized to adopt appropriate regulations. 45 U.S.C. § 431. *Norfolk & Western R. Co. v. Public Utilities Com.*, 926 F.2d 567, 570 (6th Cir.1991). That authority is exercised by the Federal Railroad Administration ("FRA"), which "enforces the FRSA and promulgates railroad safety regulations." *Missouri P. Railroad v. Railroad Com. of Texas*, 850 F.2d 264, 266 (5th Cir.1988).

as the Secretary has adopted a rule, regulation, order, or standard covering the subject matter of such State requirement. A State may adopt or continue in force an additional or more stringent law, rule, regulation, order, or standard relating to railroad safety when necessary to eliminate or reduce an essentially local safety hazard, and when not incompatible with any Federal law, rule, regulation, order, or standard, and when not creating an undue burden on interstate commerce.

45 U.S.C. § 434.

### (a) Pre-emption of municipal authority in general

Burlington first argues that local governments may not regulate any aspect of railroad safety under § 434. According to Burlington, only states may exercise the authority conferred by that statute.

Burlington's interpretation of § 434 has been widely accepted. *See, e.g., Donelon v. New Orleans Terminal Company*, 474 F.2d 1108, 1112 (5th Cir.), *cert. denied*, 414 U.S. 855, 94 S.Ct. 157, 38 L.Ed.2d 105 (1973); *Norfolk Southern Ry. Co. v. Hapeville*, 779 F.Supp. 601, 602 (N.D.Ga.1991); *CSX Transp., Inc. v. Tullahoma*, 705 F.Supp. 385, 387 (E.D.Tenn.1988) (collecting cases). Without question, it is the prevailing view.

Of those courts which have considered the issue, *Donelon* is representative. There, the Fifth Circuit held that since § 434 refers to "States," but not their political subdivisions, Congress must have intended to preclude local governments from promulgating railroad safety regulations. 474 F.2d at 1112.

*Donelon*'s narrow construction of the term "State" is now open to question, however. In *Wisconsin Public Intervenor v. Mortier, supra,* the Supreme Court rejected virtually identical reasoning.

**4.** 7 U.S.C. § 136v provides, in part:
(a) A State may regulate the sale or use of any federally registered pesticide or device in the State, but only if and to the extent the regulation does not permit any sale or use prohibited by this subchapter.

*Mortier* arose under the Federal Insecticide, Fungicide and Rodenticide Act ("FIFRA"), 7 U.S.C. §§ 136–136y (1991).[4] Although § 136v permits states to regulate pesticides subject to certain restrictions, it is silent with regard to local regulation. Thus, when a small Wisconsin town enacted pesticide regulations, a property owner argued that the regulations were pre-empted.

The Supreme Court found the language of § 136v to be "wholly inadequate to convey an express preemptive intent." *Mortier,* — U.S. at ——, 111 S.Ct. at 2483. "Mere silence," the Court said, would not "suffice to establish a 'clear and manifest purpose' to pre-empt local authority." *Id.* (quoting *Rice v. Santa Fe Elevator Corp.,* 331 U.S. 218, 230, 67 S.Ct. 1146, 1152, 91 L.Ed. 1447 (1947)). Moreover, the Court went on to observe that it is well established that units of local government are created to exercise such powers as a state may entrust to them. *Id.* Consequently, "the exclusion of political subdivisions cannot be inferred from the express authorization to the 'State[s]' because political subdivisions are components of the very entity the statute empowers." *Id.*

Like FIFRA, the Federal Railroad Safety Act specifically authorizes state regulation, but is silent with respect to local authority. That circumstance led the *Donelon* court to conclude that, by using the term "State," Congress intended to exclude local governments from the scope of § 434.

We now know, however, that the term "State" is not "self-limiting." *Mortier,* — U.S. at ——, 111 S.Ct. at 2485. To the contrary, the express delegation of regulatory authority to a state may well mean that it is permitted to redelegate its authority to a "political subdivision[ ] either specifically or by leaving undisturbed ... existing statutes that would otherwise pro-

(b) Such State shall not impose or continue in effect any requirements for labeling or packaging in addition to or different from those required under this subchapter.

vide [a] local government with ample authority to regulate." *Id.*[5]

■ It follows, then, that *Donelon* is not dispositive. The mere fact that § 434 allows state regulation (while remaining silent regarding municipal authority) does not demonstrate that local governments are expressly precluded from utilizing the power conferred by that section.

Since Burlington has suggested no other basis for finding express pre-emption, and the FRSA does not address the question of municipal regulatory authority, it is appropriate to consider the remaining grounds for pre-emption. *See Cipollone v. Liggett Group, Inc.,* — U.S. at —, 112 S.Ct. at 2625 (federal courts should resort to principles of implied pre-emption only when the pre-emptive scope of the statute is not expressly defined) (Blackmun, J., concurring in part).

■ In this context, pre-emption of local authority cannot be implied since the FRSA does not occupy the field of railroad safety regulation. *Marshall v. Burlington Northern, Inc.,* 720 F.2d 1149, 1153 (9th Cir.1983). " 'Congress allowed the states to continue regulating until displaced by federal rules in the same area.' " *Id.* (quoting *Consolidated Rail Corp. v. Pennsylvania Public Utilities Comm'n,* 536 F.Supp. 653, 656–57 (E.D.Pa.1982)).

■ Nor does local regulatory authority necessarily stand as an obstacle to the accomplishment of Congressional objectives. Although one of the explicit purposes of the FRSA is uniformity of railroad regulation, *Marshall,* 720 F.2d at 1153, section 434 confers upon states the power to enact rules more stringent than those promulgated by the Secretary of Transportation "when necessary to eliminate or reduce an essentially local safety hazard." After *Mortier,* that provision can plausibly

be read to contemplate the active participation of municipalities in the regulatory process, at least with regard to local safety hazards. At a minimum, such language indicates that Congress chose to temper its objectives to accommodate local needs. Either way, the existence of municipal regulatory authority would not frustrate the statutory scheme which Congress created.

Granted, Congress might well be concerned "if the railroads were subject to differing regulations in every municipality in the United States." *CSX Transp., Inc.,* 705 F.Supp. at 388. But that does not appear to be the case, much less the primary impulse behind the FRSA. *Flohr,* 570 F.2d at 1308.

### (b) *Pre-emption of Ordinance # 605 in particular*

■ The fact that municipalities may be entitled to enact railroad safety regulations does not mean that this ordinance can be upheld. After all, § 434 specifically pre-empts state (or local) rules once the Secretary of Transportation has promulgated a regulation covering the same subject matter.

Burlington has filed a code of operating rules with the Federal Railroad Administrator. (Affidavit of Steve P. Mallory (Ct.Rec. 19).) Because Burlington was required to file its operating rules, 49 C.F.R. § 217.7, and because a willful violation of the rules could result in federal sanctions, 49 C.F.R. § 217.5, the operating rules have (arguably) acquired the force of a federal regulation.

Burlington's operating rules appear to require locomotive crews to sound the very whistle blasts which Connell's ordinance would prohibit. (Mallory Affidavit, Exhibit A–3.) Assuming the operating rules can be construed as a federal "rule, regulation,

---

**5.** The State of Washington began regulating the use of locomotive whistles long before the FRSA was enacted. RCW 81.48.010. Insofar as Washington jurisprudence is concerned, the existence of a state statute does not automatically pre-empt local action. *See Tacoma v. Luvene,* 118 Wn.2d 826, 833, 827 P.2d 1374 (1992) ("cities have the right to enact ordinances prohibiting the same acts prohibited by state law so long as the state enactment was not intended to be exclusive and the city ordinance does not conflict with the general law of the state"). Thus, Washington law may illustrate the very redelegation of state authority that the Supreme Court spoke of.

order or standard," Connell's ordinance must yield. 45 U.S.C. § 434.[6]

### 2. Locomotive Boiler Inspection Act

■■■■ Under the LBIA, the Secretary of Transportation is authorized to prescribe and regulate "all parts and appurtenances of locomotives." 45 U.S.C. § 23. The sweeping nature of the Secretary's authority reflects the fact that Congress intended the federal government to occupy the entire field of locomotive equipment regulation. *Marshall,* 720 F.2d at 1152 (citing *Napier v. Atlantic Coast Line R.R.,* 272 U.S. 605, 612–13, 47 S.Ct. 207, 209–10, 71 L.Ed. 432 (1926)). The LBIA pre-empts any state rule which encompasses " 'an integral or essential part of a completed locomotive ...,' " or any " *'parts or attachments definitely prescribed by lawful order of the [Secretary]....' " Marshall,* 720 F.2d at 1152 (quoting *Southern Railway Co. v. Lunsford,* 297 U.S. 398, 402, 56 S.Ct. 504, 506, 80 L.Ed. 740 (1936)) (emphasis added by Court of Appeals).

■■■■ Connell argues that its ordinance does not fall within the pre-emptive scope of § 23. According to Connell, that section "relates to the equipment that a locomotive is required to carry[,] and the condition of that equipment[,] rather than to the use of the whistle." (Memorandum of Defendant Connell (Ct.Rec. 16) at 4.)

Connell's argument misconceives the nature of implied pre-emption. "When the Federal Government completely occupies a given field or an identifiable portion of it, as it has done here, the test of pre-emption is whether 'the matter on which the State asserts the right to act is in *any way* regulated by the Federal Act.' " *Pacific Gas & Electric Co. v. State Energy Resources Conservation and Development Comm'n,* 461 U.S. 190, 212–213, 103 S.Ct. 1713, 1726–27, 75 L.Ed.2d 752 (1983) (quoting *Rice v. Santa Fe Elevator Corp.,* 331 U.S. 218, 236, 67 S.Ct. 1146, 1155, 91 L.Ed. 1447 (1947) (emphasis added)).

■■■■ The LBIA was enacted to ensure the safe operation of railroad locomotives. *See King v. Southern Pacific Transp. Co.,* 855 F.2d 1485, 1488 n. 1 (10th Cir.1988). To that end, a locomotive must be equipped with "an audible warning device" which produces a specified minimum level of sound. 49 C.F.R. § 229.129. "The device shall be arranged so it can be conveniently operated from the engineer's normal position in the cab." *Id.* Furthermore, use of an audible warning device is exempt from federal noise control regulations when the device is operated for safety purposes. 49 C.F.R. § 210.3(b)(3). *See Norfolk Southern Ry. Co. v. Hapeville,* 779 F.Supp. at 604.

In view of these regulations, it is clear that the subject of locomotive whistles is regulated by the federal government. Consequently, Connell's attempt to characterize § 23 as a statute which mandates certain equipment (but does not regulate its use) is beside the point. Ordinance # 605 falls well within the field occupied by the LBIA.

### B. Irreparable Injury

■■■■ Burlington has demonstrated that restricting the use of locomotive whistles in Connell would be likely to increase the risk of collisions at the town's two railroad crossings. (Affidavit of Kenneth E. Cottingham (Ct.Rec. 7).) That showing is sufficient to establish the possibility of irreparable injury. *See Norfolk Southern Ry. Co.,* 779 F.Supp. at 604.

### III. CONCLUSION

Since Connell's ordinance is subject to pre-emption, and Burlington and the motoring public would be exposed to significant risk as a result of Connell's restrictions on the use of locomotive whistles, Burlington's request for a preliminary injunction

---

**6.** There is reason to believe restricting the use of locomotive whistles jeopardizes safety. (Affidavit of Kenneth E. Cottingham (Ct.Rec. 7).) Thus, the terms of this particular ordinance may frustrate the objectives of the FRSA even though the existence of municipal regulatory authority, in general, does not. The Court need not reach that issue given its determination that Burlington's operating rules suffice to trigger pre-emption.

will be granted. That does not mean the Court is unsympathetic to the complaints voiced by the residents of Connell. To the contrary, the Court would hope that Burlington will work with the townspeople to solve a truly vexing problem.

IT IS HEREBY ORDERED:

1. Burlington's motion for a preliminary injunction (Ct.Rec. 2) is granted. The City of Connell is enjoined from enforcing Ordinance #605 pending trial on the merits.

2. No security will be required of Burlington. Fed.R.Civ.P. 65(c).

IT IS SO ORDERED.