**Nylan ELDRIDGE, Individually and as Administrator of the Estates of Amy Jaree Eldridge, Deceased, and Andy Jack Eldridge, Deceased, and Amber Lashawn Eldridge, a minor, and Billy Blake Eldridge, a minor, by and through their parent and next friend, Nylan Eldridge, Plaintiff,**

v.

**MISSOURI PACIFIC RAILROAD d/b/a Union Pacific Railroad Company, a Foreign Corporation, Defendant.**

No. 92–486–P.

United States District Court, E.D. Oklahoma.

July 26, 1993.

James T. Branam, Antlers, OK, Billy Mickle, Durant, OK, for plaintiff.

A. Camp Bonds, Jr., Juliet N. Brennan, Muskogee, OK, for Missouri Pacific R. Co.

## ORDER

PAYNE, United States Magistrate Judge.

This action came on for hearing on June 3, 1993, before Magistrate Judge James H. Payne pursuant to an order of the court entered May 27, 1993. The plaintiff appeared by and through his attorney of record, James T. Branam, and the defendant was represented by counsel of record, A. Camp Bonds, Jr. and Juliet N. Brennan. After consideration of all pleadings on file herein, and the arguments and statements of counsel, this court makes the following determination.

In the instant case, a diversity action, plaintiff Nylan Eldridge asserts multiple claims of negligence against the defendant for damages sustained as a result of an automobile and train collision occurring on May 4, 1992, at a crossing in Atoka County, Oklahoma. The plaintiff claims the defendant's negligence caused the collision between his wife, Amy Jaree Eldridge, and his minor son, Andy Jack Eldridge, resulting in both their deaths.[1]

Before the court for its consideration is the defendant's motion for partial summary judgment on the following issues: 1) the adequacy of the locomotive warning devices; 2) the reasonableness of the train's speed; and 3) the adequacy of the grade-crossing warning devices. The defendant seeks a determination that the plaintiff's state and common-law allegations of negligence concerning these three areas—grade crossing warning devices,

---

1. The plaintiff, Nylan Eldridge, is the Personal Representative of the Estates of Amy Jaree Eldridge, deceased, and Andy Jack Eldridge, deceased, and will present the claims of their estates, his claims as surviving spouse of Amy and father of Andy, claims of the two surviving children for the loss of their mother, and for Amy's surviving parents, Jack Loftiss and Ann Loftiss.

locomotive warning devices, and train speed—are preempted by federal law.

### Locomotive Warning Devices

■ The court finds that federal law preempts state law with respect to allegations concerning the adequacy of the locomotive warning devices. The Boiler Inspection Act, 45 U.S.C. §§ 22–34, totally occupies the field of locomotive equipment regulation and states are prevented from prescribing requirements for locomotives. *Napier v. Atlantic Coast L.R.R.*, 272 U.S. 605, 610–13, 47 S.Ct. 207, 208–10, 71 L.Ed. 432 (1926); *King v. Southern Pacific Transp. Co.*, 855 F.2d 1485, 1488–90 (10th Cir.1988); *Marshall v. Burlington Northern, Inc.*, 720 F.2d 1149, 1151–54 (9th Cir.1983). Further, the plaintiff concedes this issue by stating that "he presently has no evidence that the locomotive in question was inadequately equipped under state law or the Boiler Inspection Act." (Plaintiff's Response to Defendant's Motion for Partial Summary Judgment at 2).

Consequently, the court finds the plaintiff's negligence allegations concerning the adequacy of the locomotive warning devices are preempted and there remain no questions of fact in this regard precluding summary judgment. Therefore, the defendant's Partial Motion for Summary Judgment should be sustained in this respect.[2]

### Train Speed Regulations

■ Originally, the plaintiff sought to hold the defendant accountable for its alleged failure to operate "[its] train at a safe speed, with due regard for local conditions." (Plaintiff's Amended Complaint at 3, and Plaintiff's Response to Defendant's Motion for Partial Summary Judgment at 10). In the interim

the United States Supreme Court addressed this issue in *CSX Transportation, Inc. v. Easterwood*, —— U.S. ——, 113 S.Ct. 1732, 123 L.Ed.2d 387 (1993), finding that the subject of speed regulations is preempted by the Federal Railroad Safety Act of 1970, 45 U.S.C. § 421 et seq. (FRSA). The plaintiff concedes this issue citing *Easterwood.* (Plaintiff's Supplement to Brief Filed September 3, 1992 on Preemption).

In *Easterwood,* the Supreme Court determined that regulations, codified at 49 C.F.R. § 213.9(a)[3], setting the maximum allowable operating speeds for freight and passenger trains preempted a negligence claim based on a common-law duty on the part of the railroad to operate its train at a moderate and safe rate of speed. The Supreme Court held that the preemptive effect of these regulations is governed by section 434 of the FRSA[4] which clearly confers on the Secretary the power to preempt state common-law.

> On their face, the provisions of § 213.9(a) address only the maximum speeds at which trains are permitted to travel given the nature of the track on which they operate. Nevertheless, related safety regulations adopted by the Secretary reveal that the limits were adopted only after the hazards posed by track conditions were taken into account. Understood in the context of the overall structure of the regulations, the speed limits must be read as not only establishing a ceiling, but also precluding additional state regulation of the sort which respondent seeks to impose on petitioner.

2. While the plaintiff concedes the issue of the adequacy of the locomotive warning devices, he does not concede the related issue of the train crew's alleged negligence in failing to sound the whistle. To the extent the defendant's motion addresses this issue, the court finds that factual issues remain precluding the entry of summary judgment.

3. The regulations were issued by the Secretary of Transportation pursuant to the FRSA.

4. Section 434 provides:

The Congress declares that laws, rules, regulations, orders, and standards relating to rail-

road safety shall be nationally uniform to the extent practicable. A State may adopt or continue in force any law, rule, regulation, order, or standard relating to railroad safety until such time as the Secretary has adopted a rule, regulation, order, or standard covering the subject matter of such State requirement. A State may adopt or continue in force an additional or more stringent law, rule, regulation, order, or standard relating to railroad safety when necessary to eliminate or reduce an essentially local safety hazard, and when not incompatible with any Federal law, rule, regulation, order, or standard, and when not creating an undue burden on interstate commerce.

*Id.* at ——, 113 S.Ct. at 1742. In the instant case it is undisputed that the track in question is a class four track for which the maximum speed is 60 miles per hour, and that there is no evidence to indicate that the defendant's train was traveling in excess of 60 miles per hour.

Based on the foregoing reasons, the court finds that the plaintiff's negligence claim based upon allegations of excessive speed is preempted.

### Grade Crossing Warning Devices

Finally, the defendant seeks a determination that the plaintiff's negligence claim based on the inadequacy of the grade crossing warning devices is preempted. Relying on *Easterwood* and federal regulations for the installation of crossing warning devices, 23 C.F.R. § 646.214(b)(3) and (4)[5], the defendant argues that preemption is appropriate since federal funds were used to install the warning devices at the crossing in the instant case.

In *Easterwood*, a diversity wrongful death action against CSX was instituted by Lizzie Easterwood after her husband was killed by a train, owned and operated by CSX, which collided with his truck at a Georgia crossing. Lizzie Easterwood alleged that CSX was negligent under Georgia law for failing to maintain adequate warning devices at the crossing and for operating the train at an excessive speed.

The Court held that under the FRSA, federal regulations adopted by the Secretary of Transportation preempted Easterwood's negligence action only insofar as it asserted that CSX's train was traveling at an excessive speed. In regard to Easterwood's grade crossing claim, the Court determined that where warning devices are installed pursuant to 23 C.F.R. §§ 646.214(b)(3) and (4), which cover all federally funded installations at crossings[6], state law, including tort law which seeks to impose an independent duty on a railroad to identify and/or repair dangerous crossings, is preempted by federal law. Construing a 1979–1980 decision by the DOT to install a gate at the Georgia crossing, and then a later decision to shelve the plan for the gate and allocate the funds for use in another project, the Court found that preemption did not occur because 23 C.F.R. §§ 646.214(b)(3) and (4) were not applicable.

The Court found that preemption occurs when these sections apply because they establish requirements for the installation of particular warning devices. Only when the strict mandates of sections 646.214(b)(3) and (4) have been complied with may a railroad be relieved of its "joint responsibility [with the states] for traffic safety at crossings" because state decisionmaking authority is displaced *Id.* at ——, 113 S.Ct. at 1740.

In order to meet the requirements of section (3)(i), any project where Federal-aid funds participate in the installation of warning devices is to include automatic gates with

**5.** Sections 646.214(b)(3) and (4) read:

(3)(i) *Adequate Warning Devices*, under § 646.-214(b)(2) **or on any project where Federal-aid funds participate in the installation of the devices** are to include automatic gates with flashing light signals when one or more of the following conditions exist:
(A) Multiple main line railroad tracks.
(B) Multiple tracks at or in the vicinity of the crossing which may be occupied by a train or locomotive so as to obscure the movement of another train approaching the crossing.
(C) High Speed train operation combined with limited sight distance at either single or multiple track crossings.
(D) A combination of high speeds and moderately high volumes of highway and railroad traffic.
(E) Either a high volume of vehicular traffic, high number of train movements, substantial numbers of school-buses or trucks carrying hazardous materials, unusually restricted sight distance, continuing accident occurrences, or any combination of these conditions.
**(F) A diagnostic team recommends them.**
**(ii) In individual cases where a diagnostic team justifies that gates are not appropriate, FHWA may find that the above requirements are not applicable.**
**(4) For crossings where the requirements of § 646.214(b)(3) are not applicable,** the type of warning device to be installed, whether the determination is made by a State regulatory agency, State highway agency, and/or the railroad, is subject to the approval of the FHWA. (emphasis added).

**6.** 23 C.F.R. § (3)(i) specifically states that it applies to "any project where Federal-aid funds participate in the installation of the [warning] devices."

flashing light signals when one or more of the conditions set forth in subsections (A) through (E)[7] apply, or a diagnostic team recommends them as set forth in subsection (F). Section (3)(ii) dictates that only in individual cases where a diagnostic team "justifies that gates are not appropriate", may the FHWA dispense with the requirements of section (3)(i) before giving its approval.

It is clear from the language of the statute that section (4) does not apply until there has been a determination by a diagnostic team under section 3(ii), either recommending the necessity of automatic gates with flashing signals, or a determination by a diagnostic team that 'justifies' dispensing with such a requirement. Section 4 explicitly begins, "For crossings where the requirements of § 646.214(b)(3) are not applicable ...". The single method available under § 646.214(b)(3) to determine whether the requirements of § 646.214(b)(3)(i) are not applicable is to have a diagnostic team make such an evaluation as set forth in section 3(ii). Only after "railroad participation in diagnostic teams, *which either recommend the use or nonuse of crossing gates*", is the responsibility of determining the need and selection of warning devices delegated to a State agency or the railroad, subject still to FHWA approval. *Easterwood* at ——, 113 S.Ct. at 1741. (emphasis added).

The record establishes that federal funds were expended on the crossing in the instant case. On December 12, 1978, the Oklahoma Corporation Commission ordered that "all railroad cross-buck signs, which all railroads operating in Oklahoma shall erect or replace, pursuant to the adoption of the Federal Manual on Uniform Traffic Devices (M.U.T.C.D.) by the Oklahoma Department of Transportation Commission shall be of the design and in compliance with Appendix (a) ...".[8] Pursu-

ant to the Corporation Commission's Order, the defendant and the Oklahoma Department of Transportation entered into a Project Agreement for "Federal–Aid Railroad Grade Crossings Project RRP–000s(309)". This agreement covered the installation of additional crossbuck signs and upgrading of existing crossbuck signs where needed at all public crossings of the defendant's tracks in the State of Oklahoma. The Agreement provided that "Federal Grade Crossing Project Money shall be used to provide 90% of the costs ..."

In support of its motion, the defendant submits the affidavit of Doyle W. Beaver who was the Roadmaster of the Choctaw Subdivision of the Missouri–Kansas–Texas Railroad (MKT) during the time period in question. The Choctaw Subdivision is the subdivision wherein the subject crossing is located. The defendant contends in June 1979, Mr. Beaver was supplied with a list of crossings which had been sent to the MKT by the Oklahoma Department of Transportation (ODOT). Mr. Beaver then conducted a survey of those crossings in order to determine what was "necessary to provide two (2) double faced reflectorized crossbucks at each crossing." (Letter of P.E. Jacquinot to Mr. Beaver dated June 13, 1979 attached to the Defendant's Supplemental Brief on Preemption). Upon completion of his survey, Mr. Beaver generated a report, which is attached to his affidavit, indicating the condition of the crossbucks at each crossing, including the crossing in the instant case.

The defendant contends that the FHWA approved the project on January 3, 1980. According to the defendant the project was completed in June, 1982. Crossbuck signs and new posts were installed at the instant crossing on June 1, 1982. Ninety per cent

---

7. It is undisputed that subsections (A) through (E) do not apply in the instant case because the subject crossing is a rural grade crossing located on a dirt/gravel county road.

8. MUTCD Section 8B–2 states in pertinent part: The railroad crossing sign, a regulatory sign, commonly identified as the "crossbuck" sign, as a minimum shall be white reflectorized sheeting or equal, with the words RAILROAD CROSSING in black lettering. *As a minimum one crossbuck sign shall be used on each road-*

*way approach to every grade crossing,* alone or in combination with other traffic control devices. If there are two or more tracks between the signs, the number of tracks shall be indicated on an auxiliary sign of inverted T shape mounted below the crossbuck in the manner and at the heights indicated in figure 8–1 except that use of this axillary sign is optional at crossings with automatic gates ... (emphasis added).

(90%) of the cost of the project was paid for with Federal funds, and the defendant paid the remaining ten percent (10%) of the cost.

Focusing on a select portion of the *Easterwood* decision, the defendant argues that preemption has occurred. The defendant cites the following language:

In short, for projects in which federal funds participate in the installation of warning devices, the Secretary has determined the devices to be installed and the means by which railroads are to participate in their selection. The Secretary's regulations therefore cover the subject matter of state law which, like the tort law on which respondent relies, seeks to impose an independent duty on a railroad to identify and/or repair dangerous crossings.

Based upon this language the defendant argues that once federal funds have been expended pursuant to 23 C.F.R. § 646.214(b)(3) and (4), for the installation of warning devices, preemption automatically occurs. The court, however, finds this logic to be contradictory to the rationale of *Easterwood*.

In *Easterwood*, the Court noted that "under ss 646.214(b)(3) and (4), a project for the improvement of a grade crossing must *either* include an automatic gate *or* receive FHWA approval *if* federal funds participate in the installation of the [warning] devices." *Id.* at —— – ——, 113 S.Ct. at 1740–1741. (emphasis added). The expenditure of federal funds is but one element to invoke the preemption afforded under sections 646.214(b)(3) and (4). Also necessary, according to the plain language of the regulation, is the approval of the FHWA.

■ The defendant submits a letter from Gordon E. Penney, the Division Administrator of the U.S. Department of Transportation Federal Highway Administration (FHWA), authorizing the project agreement to install the crossbucks and posts at various crossings in the state of Oklahoma, including the subject crossing, as FHWA approval.

The letter, addressed to Mr. Ward, the Director of the Oklahoma Department of Transportation, and dated January 3, 1980, consists of two paragraphs which are set forth in their entirety:

You are authorized to proceed with all actions necessary for completion of the subject project in accordance with the approved program item and FHPM 8–2–3. *This authorization is given with the understanding that an evaluation of the safety benefits and effectiveness of the project will be made in accordance with the provisions of the Federal-aid Highway Program Manual.*

(emphasis added). It is clear that any purported approval by the FHWA as stated in this letter, was contingent upon compliance with the provisions of the Federal-aid Highway Program Manual. There is no further documentation in the record to establish that the approval of the FHWA was ever finalized, or the contingencies resolved.

More importantly, the court finds that the approval given by Mr. Penney on behalf of the FHWA could not have ever been finalized due to the defendant's admission that the subject crossing was not surveyed by a diagnostic team. The defendant states, "[a]lthough a survey was made of the crossings, Defendant does not contend that the survey was made by a "diagnostic team". This is of no consequence, however, for the crossing in this case falls under paragraph four (4) of 23 C.F.R. § 646.214(b), which does not require a diagnostic team evaluation." (Defendant's Supplemental Brief on Preemption at 7).

The language of 23 C.F.R. § 646.-214(b)(3)(i)(F) and 3(ii) mandate the use of a diagnostic team before the railroad may use its own discretion, or delegate its authority, to determine the type of warning devices necessary for individual crossings under section (4). Section 3(i)(F) states that automatic gates with flashing light signals are required when a diagnostic team recommends them. Section 3(ii) distinctly delineates the requirement that before the FHWA can find that automatic gates with flashing light signals are *not* required, a diagnostic team must justify that such devices are not appropriate. Section (4) only comes into play "for crossings where the requirements of § 646.-214(b)(3) are not applicable." As is apparent from a plain reading of section 3(ii), a determination under section (4) that the require-

ments of section (3)(i) are not applicable must first be made by a diagnostic team.

The defendant concedes that the inspection of crossings conducted by Mr. Beaver to determine the condition of crossbucks, tracks, and posts, as requested by Mr. Jacquinot, did not amount to a study of the crossings by a "diagnostic team". At the very least a "team" implies more than one person.

This interpretation of sections 646.-216(b)(3) and (4) is in accordance with the railroad's own directives. The Rail–Highway Grade Crossing Study states at 4–9:

Based on an engineering and traffic investigation, a determination is made as to which type of traffic control system is required at a crossing. This investigation is made by a diagnostic team. *As a minimum*, this team should consist of a highway traffic engineer and a railroad signal engineer. Other members of the team should include, as appropriate, representatives of highway design and maintenance agencies, and Federal, State, and local government officials. (Emphasis added).

The *Manual on Uniform Traffic Control Devices* (MUTCD) also notes at page 1A–4:

IA–4 Engineering Study Required

The decision to use a particular device at a particular location should be made on the basis of an engineering study of the location. Thus, while this Manual provides standards for design and application of traffic control devices, the Manual is not a substitute for engineering judgment. It is the intent that the provisions of the Manual be standards for traffic control devices installation but not a legal requirement for installation.

Qualified engineers are needed to exercise the engineering judgment inherent in the selection of traffic control devices, just as they are needed to locate and design the roads and streets which the devices complement. Jurisdictions with responsibility for traffic control, that do not have qualified engineers on their staffs, should seek assistance from the State highway department, their county, a nearby large city, or a traffic consultant.

Finally, in 23 C.F.R. 646.204 defines a diagnostic team as follows:

(g) "A diagnostic team" means a group of knowledgeable representatives of the parties of interest in a railroad-highway crossing or a group of crossings.

After the engineering study or evaluation by the diagnostic team, the final selection of a proper signal device is made by the public agency with jurisdictional authority. (MUTCD 8A–1) Section 8A–1 states:

The highway agency and the railroad company are entitled to jointly occupy the right of way in the conduct of their assigned duties. This requires joint responsibility in the traffic control function between the public agency and the railroad. The determination of need and selection of devices at grade crossings is made by the public agency with jurisdictional authority. Subject to such determination and selection, design, installation and operation shall be in accordance with the national standards herein.

The Secretary does not interpret this statement in the MUTCD as giving the local jurisdiction exclusive authority over the selection of traffic control devices:

Often the highway engineer and the railroad engineer will share responsibility at the grade crossing. The extent of their responsibilities will vary depending on State laws and practices; however, both must have an understanding of the interaction between train, motor vehicle and control devices.

D.O.T. Handbook at 8A. These excerpts from the defendant's own materials are compatible with the rationale of *Easterwood*, wherein the Court encouraged 'separate spheres of responsibility' between the states and the railroad, and stated that "railroads— the entities arguably most familiar with crossing conditions [could] provide current and complete information to the state agency responsible for determining priorities for improvement projects in accordance with § 924.9." *Id.* at ——, 113 S.Ct. at 1739. The Court further noted that sections (3) and (4) "envision railroad involvement in the selection of warning devices through their par-

ticipation in diagnostic teams which may recommend the use or nonuse of crossing gates." *Id.* at ——, 113 S.Ct. at 1741.[9]

The record establishes that the crossing in question was included in a federally funded project for the installation of crossbucks, and prior to the time of the collision on May 4, 1992, federal money had actually been expended. The court finds, however, that there is no documentation in the record of approval from the FHWA of the project agreement concerning the instant crossing. To the contrary, based upon the admission of the defendant that no diagnostic team was utilized to study the subject crossing, pursuant to section 3(ii) there was no basis for FHWA approval or disapproval.

"In light of the relatively stringent standard set by the language of section 434 and the presumption against pre-emption, and given that the regulations provide no affirmative indication of their effect on negligence law," the United States Supreme Court was "not prepared to find pre-emption solely on the strength of the general mandates of 23 C.F.R. pt. 924." *Id.* at ——, 113 S.Ct. at 1739. The Court found that the regulations of 23 C.F.R. pt. 924 did not alone support petitioner's claim of pre-emption. In this regard the Court noted, "These provisions establish the general terms of the bargain between the federal and state governments: the States may obtain federal funds if they take certain steps to ensure that the funds are efficiently spent. On its face, this federal effort to encourage the States to rationalize their decision-making has little to say about the subject matter of negligence law, because, with respect to grade crossing safety, the responsibilities of railroads and the State are, and traditionally have been, quite distinct." *Id.* Likewise, this court finds that the railroad's compliance with the minimum requirements set forth in the MUTCD, section 8B-2, in order to obtain federal funding, does not afford the defendant preemption in the area of grade crossing warning devices. Accordingly, Defendant's Motion for Partial Summary Judgment as to this issue is denied.

**IT IS SO ORDERED.**

[redacted]

9. The Highway Safety Improvement Program found in 23 C.F.R. 924 ff provides for improvement of safety on all public roads and for interaction between the Federal Highway Administration, the state, and local government officials where practical. (23 C.F.R. 924.7). Part 924.-9(a)(3) claims the planning process *shall incorporate* "a process for conducting engineering studies of hazardous locations, sections and elements to develop highway safety improvement projects as defined in 23 U.S.C. § 101(a)." (emphasis added).