**Robert S. SPRINGSTON, Plaintiff,**

**v.**

**CONSOLIDATED RAIL CORP., et al., Defendants.**

**No. 3:93 CV 7233.**

United States District Court, N.D. Ohio, Western Division.

July 5, 1994.

John Douglas Liber, Dennis R. Lansdowne, Spangenberg, Shibley, Traci, Lancione & Liber, Cleveland, OH, Ralph E. Jocke, Patricia Ann Walker, Walker & Jocke, Medina, OH, for plaintiff.

Richard S. Milligan, Philip E. Howes, Thomas R. Himmelspach, Robert B. Daane, Vogelgesang, Howes, Lindamood & Brunn, Canton, OH, for Consolidated Rail Corp.

Thomas J. Sweeney, Pietragallo, Bosick & Gordon, Pittsburgh, PA, for General Motors Corp.

David J. Hanna, Buckingham, Doolittle & Burroughs, Akron, OH, for David J. Hanna.

## *MEMORANDUM OPINION*

DOWD, District Judge.

This case is before the Court on the motion of defendant General Motors Corporation, Electro–Motive Division ("General Motors") summary judgment, and the motion of defendant Consolidated Rail Corporation ("Conrail") for partial summary judgment. Plaintiff opposes both motions, and both Conrail and General Motors have filed reply briefs. This Court has jurisdiction pursuant to 28 U.S.C. § 1332.

## I. *FACTUAL BACKGROUND*

This case arises out of a collision between a car and a train at a railroad crossing in northwestern Ohio, south of Bowling Green. The driver of the car was plaintiff Robert Springston, who was en route from the University of Southern Illinois to Crotch Island, Maine. The collision occurred at approximately 11:30 p.m. when Conrail's train was traveling northbound on the single, main track, and Springston was traveling east on Route 281. Springston's pickup truck was struck when he drove in front of the train. Springston was rendered a quadriplegic.

Springston brings this action against Conrail, alleging, in part, that Conrail caused the collision by negligently failing to install different warning equipment on the locomotive.[1] Specifically, plaintiff alleges that the lead locomotive was not equipped with the audible warning devices or the visual warning devices necessary to warn of the trains presence, and was not painted so as to warn of the train's presence. Plaintiff also alleged that Conrail caused the collision by operating the train with a "defective" locomotive.

Springston also brings suit against General Motors, the manufacturer of the locomotive at issue, alleging again that the locomotive was defective. Springston presents his claims against General Motors pursuant to Ohio Revised Code §§ 2307.75(A) (product defective in design or formulation), 2307.77 (products defective due to non-conformance with manufacturers' representation), 1302.27 (implied warranty, merchantability; usage of trade), and 1302.28 (implied warranty; fitness for a particular purpose). Plaintiff also alleges a claim for punitive damages against General Motors.

Both Conrail and General Motors have moved for summary judgment. Although the two defendants filed separate motions for summary judgment, both defendants present the same issue: are plaintiff's claims that the locomotive should have been equipped with reflective materials and strobe, ditch and/or oscillating lights preempted by the Boiler Inspection Act ("BIA"), 45 U.S.C. § 22, *et seq.,* or the Federal Railroad Safety Act ("FRSA"), 45 U.S.C. § 421, *et seq.?* Conrail also asks for summary judgment on plaintiff's claim that the locomotive at issue was defective.

1. Plaintiff also alleges, in Count II of his Complaint, that Conrail is liable for plaintiff's injuries because it knew of ultrahazardous conditions at the crossing where the accident took place, but failed to take steps to make the crossing safer. This Count is not at issue in the summary judgment motions at bar.

## II. *SUMMARY JUDGMENT STANDARD*

Summary judgment is appropriate where there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56. When considering a motion for summary judgment, "the inferences to be drawn from the underlying facts contained in [affidavits, pleadings, depositions, answers to interrogatories, and admissions] must be viewed in the light most favorable to the party opposing the motion." *U.S. v. Diebold,* 369 U.S. 654, 655, 82 S.Ct. 993, 993, 8 L.Ed.2d 176 (1962). *See e.g., United States v. Hodges X-Ray, Inc.,* 759 F.2d 557, 562 (6th Cir.1985) and cases cited therein. The Court's favorable treatment of facts and inferences, however, does not relieve the nonmoving party of his responsibility "to go beyond the pleadings" to oppose an otherwise properly supported motion for summary judgment under Rule 56(e). *See Celotex Corp. v. Catrett,* 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986).

Once the moving party satisfies his burden to show an absence of evidence to support the nonmoving party's case, *Celotex Corp. v. Catrett,* 477 U.S. at 323, 106 S.Ct. at 2552, the party in opposition "may not rest upon mere allegation or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 256, 106 S.Ct. 2505, 2514, 91 L.Ed.2d 202 (1986). Although the showing required of the nonmoving party by Rule 56 does not go so far as to require that all opposition evidence be in a form admissible at trial, the rule does require the nonmoving party who has the burden of proof at trial to oppose a proper summary judgment motion "by any of the kinds of evidentiary material listed in Rule 56(c), except the mere pleadings themselves...." *Celotex Corp. v. Catrett,* 477 U.S. at 324, 106 S.Ct. at 2553. General averments or conclusional allegations of an affidavit, however, do not create specific fact disputes for summary judgment purposes. *See Lujan v. National Wildlife Federation,* 497 U.S. 871, 888–89, 110 S.Ct. 3177, 3188–89, 111 L.Ed.2d 695 (1990). Furthermore, unsworn statements and affidavits composed of hearsay and nonexpert opinion evidence, "do not satisfy Rule 56(e) and must be disregarded." *See Dole v. Elliott Travel & Tours, Inc.,* 942 F.2d 962, 968–69 (6th Cir.1991) (quoting *State Mut. Life Assurance Co. of Am. v. Deer Creek Park,* 612 F.2d 259, 264 (6th Cir.1979) and citing *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 158 n. 17, 90 S.Ct. 1598, 1609 n. 17, 26 L.Ed.2d 142 (1970)). Nor may a party "create a factual issue by filing an affidavit, after a motion for summary judgment has been made, which contradicts [ ] earlier deposition testimony." *Reid v. Sears, Roebuck & Co.,* 790 F.2d 453, 460 (6th Cir.1986) (citing *Biechele v. Cedar Point, Inc.,* 747 F.2d 209, 215 (6th Cir.1984)).

On a motion for summary judgment, the Court will consider "[o]nly disputes over facts that might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby,* 477 U.S. at 248, 106 S.Ct. at 2510. Nonmaterial facts will not be considered. Neither will the judge attempt to weigh the material evidence or determine its truth. *Anderson v. Liberty Lobby,* 477 U.S. at 249, 106 S.Ct. at 2510. The judge's sole function will be to determine whether there is a genuine issue for trial such that "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Id.* (citations omitted).

Where the non-moving party "has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof," summary judgment is appropriate. *Celotex Corp. v. Catrett,* 477 U.S. at 323, 106 S.Ct. at 2552 (equating the standard for a directed verdict under Rule 50(a) with the summary judgment standard of Rule 56). If the evidence is "merely colorable," or is "not significantly probative," the Court may decide the legal issue and grant summary judgment. *Anderson v. Liberty Lobby,* 477 U.S. at 249–50, 106 S.Ct. at 2510–11 (citing *Dombrowski v. Eastland,* 387 U.S. 82, 87 S.Ct. 1425, 18 L.Ed.2d 577 (1967) (*per curiam*) and *First Nat'l Bank of Ariz. v. Cities Serv. Co.,* 391 U.S. 253, 290, 88 S.Ct. 1575, 1593, 20 L.Ed.2d 569 (1968)). " 'The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff.' " *Street v. J.C. Bradford & Co.,* 886

F.2d 1472, 1477 (6th Cir.1989) (quoting *Anderson v. Liberty Lobby,* 477 U.S. at 252, 106 S.Ct. at 2512).

In sum, "[t]he inquiry performed is the threshold inquiry of determining whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby,* 477 U.S. at 250, 106 S.Ct. at 2511.

### III. *LAW AND DISCUSSION*

#### A. *The Preemption Doctrine*

Article VI, the Supremacy Clause of the United States Constitution, declares:

> This Constitution, and the laws of the United States which shall be made in Pursuant thereof, and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme law of the Land ...

It is from this Supremacy Clause that the doctrine of preemption is derived. It is designed to prevent the States from impinging too much on federal law and policy. *Louisiana Public Service Comm'n v. FCC,* 476 U.S. 355, 368, 106 S.Ct. 1890, 1898, 90 L.Ed.2d 369 (1986).

The Supreme Court has laid the path to be followed in a preemption analysis. Congress may, of course, expressly state that state law is preempted. If no such statement is made, however, preemption may be inferred because

> "the scheme of federal regulation may be so pervasive as to make reasonable the inference that Congress left no room for the States to supplement it," because "the Act of Congress may touch a field in which the federal interest is so dominant that the federal system will be assumed to preclude enforcement of state laws on the subject," or because "the object sought to be obtained by federal law and the character of obligations imposed by it may reveal the same purpose."

*Fidelity Fed'l Savings & Loan Ass'n v. de la Cuesta,* 458 U.S. 141, 153, 102 S.Ct. 3014, 3022, 73 L.Ed.2d 664 (1982) (quoting *Rice v. Santa Fe Elevator Corp.,* 331 U.S. 218, 230, 67 S.Ct. 1146, 1152, 91 L.Ed. 1447 (1947)). Where Congress intends to occupy a field, state law in that field is preempted. *Pacific Gas & Electric Co. v. State Energy Resources Conservation and Development Comm'n,* 461 U.S. 190, 212–213, 103 S.Ct. 1713, 1726–1727, 75 L.Ed.2d 752 (1983).

When facing a question of implied preemption, a court must begin with the presumption that the state law is valid. "It will not be presumed that a federal statue was intended to supersede the exercise of the power of the state unless there is a clear manifestation of intention to do so. The exercise of federal supremacy is not lightly to be presumed." *New York State Dept. of Social Services v. Dublino,* 413 U.S. 405, 93 S.Ct. 2507, 37 L.Ed.2d 688 (1973) (quoting *Schwartz v. Texas,* 344 U.S. 199, 202–203, 73 S.Ct. 232, 235, 97 L.Ed. 231 (1952)).

Defendants argue that the BIA occupies the field of locomotive equipment regulation, and therefore preempts plaintiff's state law causes of action. The BIA was enacted in 1911, and conferred on the Interstate Commerce Commission ("ICC") (now the Secretary of Transportation and the Federal Railroad Commission ("FRA")) full authority over "the entire locomotive and tender and all parts and appurtenances thereof." *Napier v. Atlantic C.L.R. Co.,* 272 U.S. 605, 608, 47 S.Ct. 207, 208, 71 L.Ed. 432 (1926) (quoting BIA amendment of 1915).

The BIA, 45 U.S.C. § 23, provides:

> It shall be unlawful for any railroad to use or permit to be used on its line any locomotive unless said locomotive, its boiler, tender, and all parts and appurtenances thereof are in proper condition and safe to operate in the service to which the same are put, that the same may be employed in the active service of such railroad without unnecessary peril to life or limb, and unless said locomotive, its boiler, tender, and all parts and appurtenances thereof have been inspected from time to time in accordance with the provisions of sections 22 to 29 and 31 to 34 of this title and are able to withstand such test or tests as may be

prescribed in the rules and regulations hereinafter provided for.

In *Napier,* the Court considered whether Congress had intended to occupy the field of locomotive equipment to the exclusion of state authority when it enacted the BIA. In that case, the railroad sought to enjoin enforcement of a Georgia statute requiring locomotives to have automatic fire box doors, and to enjoin enforcement of a Wisconsin statute requiring locomotive cabs to be equipped with a cab curtain. The Court concluded that the BIA gave the ICC full authority over "the design, the construction and the material of every part of the locomotive and tender and of all the appurtenances," and held that Congress had intended the BIA to occupy the field. The Court held that the state fire door and cab curtain laws were preempted under the BIA, even though the ICC had not issued any regulations regarding those matters. The Court opined:

> The fact that the commission has not seen fit to exercise its authority to the full extent conferred, has no bearing upon the construction of the act delegating the power. We held that state legislation is precluded, because the Boiler Inspection Act, as we construe it, was intended to occupy the field.

*Id.* at 613, 47 S.Ct. at 210. The Court held that locomotive cab curtains and automatic fire doors were "in their nature within the scope of authority delegated to the commission," *Id.* at 611, 47 S.Ct. at 209, and therefore that the state statutes were preempted.

Where the federal government has occupied a field, "the test of preemption is whether 'the matter on which the State asserts the right to act is in any way regulated by the Federal Act.'" *Pacific Gas & Electric,* 461 U.S. at 212–213, 103 S.Ct. at 1726–1727 (citations omitted). Thus, defendants argue that Congress has provided for federal authority to occupy the field of locomotive equipment, and any state regulation on the subject of locomotive equipment is preempted.

In *Marshall v. Burlington Northern, Inc.,* 720 F.2d 1149 (9th Cir.1983), the Court considered a claim identical to that of Springston: whether the railroad could be liable for a grade crossing collision under a claim alleging common law negligence for failing to install different headlights on a locomotive. The *Marshall* court held that the common law was preempted under the BIA, stating:

> [W]e hold that under the [BIA] the state may not impose liability for failure to install a part or attachment of a locomotive if it is "within the scope of the authority of the [Secretary]" to prescribe the same part or attachment.... It is within the scope of the Secretary's authority to prescribe strobe or oscillating lights for locomotives, and any state regulation is therefore preempted.

*Id.* at 1152. *See also Eldridge v. Missouri Pacific Railroad,* 832 F.Supp. 328 (E.D.Okla. 1993) (court granted partial summary judgment on plaintiff's claim that the locomotive involved in the crossing collision was equipped with inadequate warnings, stating that the claim was preempted under the BIA).

Defendants further argue that the preemptive effect of the BIA on state regulation of locomotive equipment was not affected or modified by the FRSA, which was enacted in 1970. The *Marshall* court addressed this issue, stating that the FRSA conferred upon the Secretary the authority to adopt regulations supplementing provisions of law and regulations that were in effect prior to the enactment of the FRSA. "It does not subsume, replace, or recodify any acts. The logical inference from this structure is that Congress intended to leave unchanged the force and effect of existing federal regulatory statutes." *Id.* at 1153. The *Marshall* court noted that the objective of the FRSA to achieve national uniformity of railroad regulation, 45 U.S.C. § 434, would be undermined if the FRSA were read to repeal preemption under the BIA. *Id.*

Thus, defendants argue that the BIA preempts plaintiff's state law claims. Plaintiffs cannot, therefore, impose on defendants any common law duty to install different equipment on its locomotives, and summary judgment is warranted.

Plaintiff argues that the BIA does not apply in this case. Plaintiff asserts that the

BIA was passed in response to dangers of railroading as an occupation, and that its purpose was to protect railroad employees by requiring railroad companies to provide safe equipment for their employees to work with. *See, e.g., Baltimore & Ohio R. Co. v. Groeger,* 266 U.S. 521, 45 S.Ct. 169, 69 L.Ed. 419 (1925); *Gowins v. Pennsylvania R.R. Co.,* 299 F.2d 431, 434 (6th Cir.1962), *cert. denied,* 371 U.S. 824, 83 S.Ct. 44, 9 L.Ed.2d 64 (1962).

As further support for his argument, plaintiff points out that under the BIA, an injured railroad employee does not have a cause of action. Instead, an action for violation of the BIA is prosecuted as an action under the Federal Employers' Liability Act ("FELA"), 45 U.S.C. § 51 (1988). Therefore, only railroad employees—not bystanders—can bring a cause of action for a violation of the BIA. Thus, plaintiff contends that the structure of the BIA indicates that it was enacted solely to protect railroad employees, and has no effect on bystander claims.

Plaintiff argues that it is the FRSA, not the BIA, that addresses the problem of bystander safety. Plaintiff cites the legislative history of the FRSA in support of the argument that although earlier enactments like the BIA had been effective and would be continued without change, "they [met] only certain and special types of railroad safety hazards." H.R.CONF.REP. NO. 91–1194, 91st Cong., 2nd Sess. *reprinted in* 1970 U.S.Code Cong. & Admin.News 4104. "These and other rail safety statutes have been reasonably effective in their respective areas. They were enacted to protect employees against particular hazards and the enforcement of their provisions over the years has saved lives." *Id.* However, in light of the number of crossing collisions, derailments, and spills, the public at large needed to be protected with federal legislation, thus warranting the enactment of the FRSA. *Id.*

Plaintiff does not offer any case law as support for his assertion that the BIA does not preempt his state law claims. Plaintiff argues that the *Marshall* case was wrongly decided and should be disregarded. Specifically, plaintiff argues that the *Marshall* court overlooked the fact that *Napier* involved railroad employee safety rather than bystander safety. Further, plaintiff claims that the *Marshall* case is distinguishable from the case at hand because it was decided before the 1992 amendments, codified at 45 U.S.C. § 431 (1993), to the FRSA which authorized the Secretary of Transportation to initiate proceedings to address the utility of locomotive conspicuity devices.[2] According to plaintiff, these amendments evidence the fact that Congress clearly viewed locomotive conspicuity as a matter to be regulated under the FRSA.

In short, plaintiff argues that Congress has consistently referred to the BIA as a statute for the protection of railroad employees rather than bystanders, and because the intent of Congress is critical in a preemption determination, the plaintiff's common law

2. (u) Locomotive Conspicuity

(1) The Secretary shall conduct a review of the Department of Transportation's rules with respect to locomotive conspicuity research no later than December 31, 1993. As part of this review, the Secretary shall collect relevant data from operational experience by railroads having enhanced conspicuity measures in service.

(2) Not later than December 31, 1992, the Secretary shall issue interim regulations identifying ditch lights, crossing lights, strobe lights, and oscillating lights as interim locomotive conspicuity measures, and authorizing and encouraging installation and use of such measures....

(3) Not later than June 30, 1994, the Secretary shall initiate a rulemaking proceeding to issue final regulations requiring substantially enhanced locomotive conspicuity measures. In such rulemaking proceeding, the Secretary shall consider, at a minimum—

(A) revisions to the locomotive headlight standard, including standards for placement and intensity;

(B) requiring use of reflective materials to enhance locomotive conspicuity;

(C) requiring use of additional alerting lights (including ditch, crossing, strobe, and oscillating lights);

(D) requiring use of auxiliary lights to enhance locomotive conspicuity when viewed from the side;

(E) the effect of any enhanced conspicuity measures on the vision, health and safety of train crew members; ...

45 U.S.C. § 431(u).

and products liability claims are not preempted by the BIA.

Plaintiff's argument is not well-taken. This Court agrees with the *Marshall* court that the common law was preempted under the BIA. It is within the scope of the Secretary's authority to prescribe reflective materials or strobe, ditch or oscillating lights for locomotives, and any state regulation is therefore preempted.

Plaintiff's argument is not well-taken. The Supreme Court, in *Napier,* specifically described the BIA as "preemptive of any state or local regulation on the same subject." *Napier,* 272 U.S. at 612–613, 47 S.Ct. at 210. "The power delegated to the [agency] ... extends to the design, the construction and the material of every part of the locomotive and tender and of all appurtenances." *Id.* at 611, 47 S.Ct. at 209. It is irrefutable that reflective materials and oscillating, strobe and ditch lights are parts of appurtenances of the locomotive.

Moreover, the very language of the *Napier* opinion refutes plaintiff's argument that because the purpose of the BIA was to protect railroad employees rather than bystanders, plaintiff's state law tort claims are not preempted. The *Napier* Court stated:

> The argument mainly urged by the states, in support of the claim that Congress has not occupied the entire field, is that the federal and the state laws are aimed at distinct and different evils; that the federal regulation endeavors solely to prevent accidental injury in the operation of trains, whereas the state regulation endeavors to prevent sickness and disease due to excessive and unnecessary exposure; and that whether Congress has entered a field must be determined by the object sought through the legislation, rather than the physical elements affected by it. Did Congress intend that there might still be state regulation of locomotives, if the measure was directed primarily to the promotion of health and comfort and affected safety, if at all, only incidentally?

*Napier,* 272 U.S. at 612, 47 S.Ct. at 209–210.

The Court found that the state statutes at issue and the federal regulations were directed at the same objective—the equipment of locomotives. It did not matter that the state statutes were directed to a different purpose; rather, what mattered was that the state statutes sought to regulate equipment on the locomotive. The Court opined that "[b]ecause the standard set by the Commission must prevail, requirements by the states are precluded, however commendable or *however different their purpose.*" *Id.* at 613, 47 S.Ct. at 210.

Thus, it is not the purpose of locomotive requirements that is important.[3] The statutes at issue in *Napier* could not be upheld because they placed additional requirements on locomotives. The Court deemed it irrelevant that the requirements were aimed at a different purpose than was the BIA. Similarly, in the case at bar, to allow plaintiff's state tort claims to stand would result in requirements of reflective material, oscillating, strobe and/or ditch lights on locomotives. Such lights are additional requirements on locomotives, even if they are aimed at a different evil than are headlights. As the *Napier* Court found, the BIA is preemptive of any state or local regulation on the same subject. Accordingly, pursuant to the reasoning set forth in *Napier,* plaintiff's state law negligence and product liability causes of action are preempted.

Further, this Court notes that plaintiff ignores the effect on the regulation of railroads that the adoption of his argument would have. It is clear that Congress intended to provide a nationally uniform standard of regulating locomotive equipment. If each state is permitted to make its own decisions with respect to such items as reflective materials, oscillating, strobe and ditch lights, such goal would be compromised.

Conrail also points out, in refuting plaintiff's arguments, that, in response to 45

3. The Court notes that, although the BIA was clearly enacted for the primary purpose of protecting railroad workers, it is also true that the BIA was also enacted to promote the safety of passengers and the public generally. *Brown v. Chicago, R.I. & P.R. Co.,* 108 F.Supp. 164 (N.D.Iowa 1952) (citation omitted).

U.S.C. § 431(u), directing the Secretary to issue interim regulations regarding additional locomotive lights, the FRA, at 58 Fed.Reg. 6899–64964 (May 13, 1994), issued 49 C.F.R. § 229.123. The authority for that section is listed in part as "45 U.S.C. 22–33, as amended; 45 U.S.C. 431, 438 as amended". 45 U.S.C. § 22–33 is the BIA. If, as plaintiff urges, locomotive conspicuity is a matter that relates solely to bystander safety and is therefore unrelated to the BIA, the FRA would not have cited that act as the issuing authority.

In short, this Court is not persuaded by Springston's arguments regarding the BIA, and finds that plaintiff's state common law and products liability causes of action are indeed preempted. General Motors' motion for summary judgment and Conrail's motion for partial summary judgment on the issue of preemption will therefore be granted.

B. *Claim of A Defective Locomotive*

Conrail also asks for summary judgment on plaintiff's claim that the locomotive was defective, stating that to recover on such a claim, plaintiff will have to establish that Conrail breached a duty it owed to plaintiff and that the breach was the proximate cause of the collision. *Moncol v. Board of Educ.*, 55 Ohio State 2d 72, 9 O.O.3d 75, 378 N.E.2d 155 (1978). Conrail argues that its duty with respect to the locomotive was to meet the safety standards established by the FRA in the BIA. Conrail argues that the evidence before the Court shows that it did meet those requirements. Plaintiff does not respond to Conrail's request for summary judgment on the claim of a defective locomotive.

Under Fed.R.Civ.P. 56(e), plaintiff, as the non-moving party, bears the responsibility to demonstrate that summary judgment is inappropriate. "The adverse party may not rest upon the mere allegations or denials of [his] pleadings, but [his] response, by affidavits or otherwise ..., must set forth specific facts showing there is a genuine issue for trial. If [he] does not so respond, summary judgment, if appropriate, shall be entered against [him]." Fed.R.Civ.P. 56(e). "[I]f the non-moving party fails to discharge that burden [of setting forth specific facts showing there is a genuine issue for trial]—for example, by remaining silent—its opportunity is waived and its case wagered." *Guarino v. Brookfield Township Trustees*, 980 F.2d 399, 405 (6th Cir.1992). As plaintiff has not responded to Conrail's request for summary judgment on the claim of a defective locomotive, summary judgment will be granted to Conrail on such claim.

## IV. CONCLUSION

For the reasons set forth above, this Court will grant Conrail's motion for partial summary judgment and General Motors motion for summary judgment. Plaintiff's cause of action against General Motors is, therefore, closed. Plaintiff still, however, has a cause of action against Conrail based on Count II of the Complaint which deals with the allegation of an unsafe crossing.

IT IS SO ORDERED.

*JUDGMENT ENTRY*

For the reasons stated in the Memorandum Opinion filed contemporaneously with this entry, IT IS HEREBY ORDERED, ADJUDGED and DECREED that the motion for summary judgment of defendant General Motors Corporation, Electro–Motive Division is granted. Further, the motion for partial summary judgment of defendant Consolidated Rail Corporation is also granted.

IT IS SO ORDERED.